WINTHROP et al. v. FELLOWS, Atty. Gen., et al.

(District Court, E. D. Michigan, S. D.   August 5, 1915.   On Motion for Preliminary Injunction, January 31, 1916.)

1. CORPORATIONS ☞34(6, 8)—STATUTE IN FORCE AT TIME OF INCORPORATION.
    A corporation organized under the laws of a state, its stockholders, and all others claiming under it by right of representation, are estopped to attack the validity of a provision of the act under which it was incor-porated, and which thus became a part of its charter.
    [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 92, 94–96; Dec. Dig. ☞34(6, 8).]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. CARRIERS ⬡⟹18(6)—STATUTE REGULATING RATES—SUIT TO ENJOIN ENFORCEMENT—RIGHTS OF BONDHOLDERS.

Holders of mortgage bonds of a railroad company cannot maintain a suit to enjoin the enforcement of a state statute fixing rates unless it is shown that the mortgage trustee, representing all the bondholders, has refused to bring the suit.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. ⬡⟹18(6).]

3. CARRIERS ⬡⟹18(6)—STATUTE REGULATING RATES—SUIT TO ENJOIN ENFORCEMENT.

The trustee under a railroad mortgage, which is in process of foreclosure while the railroad is in the hands of receivers, has no such interest in the future earnings of the road as to entitle it to question the validity of a rate statute, unless it is clearly shown that the mortgaged property is not of sufficient value to pay the mortgage debt after satisfying precedent liens.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. ⬡⟹18(6).]

4. CARRIERS ⬡⟹18(6)—STATUTES REGULATING RATES—INJUNCTION AGAINST ENFORCEMENT.

The rule is imperative that the operation of state statutes governing railroad passenger rates should not be enjoined, unless the confiscatory character of the rate is clear; and this rule is especially applicable to injunctions before final hearing.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. ⬡⟹18(6).]

5. CARRIERS ⬡⟹18(6)—STATUTE REGULATING RATES—INJUNCTION AGAINST ENFORCEMENT.

The showing made on application by the trustee in a railroad mortgage, which was in process of foreclosure, for a preliminary injunction restraining the enforcement of a passenger rate statute, considered, in connection with the report of the receivers of the earnings of the road under the statute for the preceding year, and *held* insufficient to establish the fact that the road operating under the statute would not earn a fair return upon an investment representing the sum necessary to be realized at the sale of the property to cover complainant's mortgage debt and precedent liens, and therefore not to warrant the granting of an injunction on the ground of threatened confiscation in whole or in part of the mortgage bond investment in question.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. ⬡⟹18(6).]

In Equity. Suit by Beekman Winthrop, Frederick Winthrop, Charles W. Cox, individually and as executor of the will of Mark T. Cox, William J. Wilson, and the Farmers' Loan & Trust Company, trustee, against Grant Fellows, Attorney General of the State of Michigan, Cassius L. Glasgow, Lawton T. Hemans, and Charles S. Cunningham, members of the Michigan Railroad Commission, Paul H. King and Dudley E. Waters, as receivers of the Pere Marquette Railroad Company, and the Pere Marquette Railroad Company. On motions for preliminary injunction. Denied.

Cadwalader, Wickersham & Taft and Geller, Rolston & Horan, all of New York City, and Frank H. Watson, of Detroit, Mich. (George W. Wickersham, Henry W. Taft, Edwin P. Grosvenor, Frederick

⬡⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Geller, and Edward H. Blanc, all of New York City, of counsel), for complainants.

Grant Fellows, Atty. Gen., and David H. Crowley and L. W. Carr, Asst. Attys. Gen., for defendants.

Before KNAPPEN and DENISON, Circuit Judges, and SESSIONS, District Judge, sitting under section 266 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1162 [Comp. St. 1913, § 1243]).

PER CURIAM. The Farmers' Loan & Trust Company is trustee under the consolidated mortgage given by the Pere Marquette Railroad Company in 1901. The individual complainants are holders of bonds secured by that mortgage and by the later refunding mortgage of 1905 (or by both of these mortgages), as well as by one or more of certain divisional mortgages antedating the consolidated mortgage. Two of the complainants are also holders of stock of the Pere Marquette Railroad Company. The bill attacks the two-cent passenger fare provision of the 1907 and 1911 amendments to the Michigan railroad statute (P. A. Mich. 1907, p. 59; P. A. Mich. 1911, pp. 476–478) as confiscatory.

[1] The present Pere Marquette Railroad Company was organized in December, 1907. At that time the statute of 1907 which is attacked was in force, and was a part of the act under which the railroad company was incorporated, and thus constituted a material part of its charter. The amendment of 1911 did not change or affect the rates of fare which the Pere Marquette was permitted to charge for the transportation of passengers. It follows that the railroad company, its stockholders, as such, and all claiming under it by right of representation, are effectually estopped to question the validity of the statute here under consideration. Having sought and accepted the rights and privileges thereby granted and conferred, they must perform the duties and obligations therein imposed. Grand Rapids & Indiana Ry. Co. v. Osborn, 193 U. S. 17, 24 Sup. Ct. 310, 48 L. Ed. 598; Commissioner of Railroads v. G. R. & I. Ry. Co., 130 Mich. 248, 89 N. W. 967; Interstate Ry. Co. v. Massachusetts, 207 U. S. 79, 28 Sup. Ct. 26, 52 L. Ed. 111, 12 Ann. Cas. 555. The last word upon this subject is found in the decision of the Supreme Court in the very recent rate case of Northern Pacific R. R. Co. v. North Dakota, 236 U. S. 585, 35 Sup. Ct. 429, 59 L. Ed. 735:

"As a corporation, the owner is subject to the obligations of its charter. As the holder of special franchises, it is subject to the conditions upon which they were granted."

Complainants have invoked the principle declared in Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 367, 14 Sup. Ct. 1047, 38 L. Ed. 1014, Id., 154 U. S. 420, 14 Sup. Ct. 1062, 38 L. Ed. 1031, and Reagan v. Mercantile Trust Co., 154 U. S. 413, 414, 418, 420, 14 Sup. Ct. 1060, 1062, 38 L. Ed. 1028, 1030, that the trustees under a railroad mortgage, whose security extends, as here, to franchises and income, have an equitable interest in the fair earnings of the road, and are entitled to maintain suit to avoid the destruction or impair-

ment of their security through the enforcement of confiscatory rates of fare.

[2] We are concerned with this question only so far as it may apply to the Farmers' Loan & Trust Company as trustee under the consolidated mortgage. The trustees of the prior divisional and subsequent refunding and other mortgages have not been made parties, and, upon this record, cannot be represented by individual bondholders. It does not appear that the trustees have refused or that they are unwilling to act. The case is not within federal equity rule 38 (198 Fed. xxix, 115 C. C. A. xxix), for here the mortgage trustee is normally the official representative of the bondholders. The trustee under the consolidated mortgage being properly before the court, it is immaterial whether the individual holders of bonds secured by that mortgage are properly joined with the trustee as parties plaintiff.

Confining the inquiry to the rights of the consolidated mortgage bondholders: The case presented differs from the situation in the Reagan Cases in the fact that there the railroads were under no disability to attack the rate statutes under consideration and joined in the prayer for relief, while here the railroad company is estopped from complaining of the rates, and defendants object that the mortgage bondholders are asking the court to compel the railroad company to do that which it cannot lawfully do. Another difference is that the Reagan Cases involved the whole schedule of rates, passenger and freight, and so affected the entire railroad income, while here only a fraction of the income is involved.

We think, however, that in view of the frame of the bill and the facts to which we shall presently call attention it is unnecessary to consider the propositions involved in this contention; and we must not be understood as expressing or intimating any opinion thereon. It will be time enough to consider them when, if ever, the record is such as to make their decision necessary. We shall for the present asume, for the purposes only of this opinion, that upon a suitable bill and upon a suitable showing the consolidated mortgage bondholders would be entitled to complain of a passenger rate found to be in fact confiscatory.

[3] This situation, however, is presented: The consolidated mortgage is in process of foreclosure in this court. The Farmers' Loan & Trust Company, as trustee, has elected to declare the mortgage and the bonds secured thereby presently due and payable. By so doing it has radically changed the character of its security and of its dependent rights. Before such election and declaration the mortgage trustee and bondholders were entitled to periodical payments of interest upon their bonds for upwards of 35 years to come, and thus had a direct interest in the revenue of the railroad, from which their interest would be payable. They are now entitled to the immediate payment of their bonds, and not to future installments of interest. Their mortgage has ceased to be primarily a future interest-bearing security, and has become a present investment, whose value depends entirely upon the amount of money which may be realized from a present sale of the mortgaged property. The consolidated mortgage

230 F.—45

and all prior incumbrances, with interest, amount to less than $45,-000,000.

An important (and, if decided in the negative, a controlling) question presented by the motion for preliminary injunction thus is: . Do the bill and the supporting affidavits show that unless the receivers are permitted, during the pendency of this suit, to put into force the statutes existing previous to the 1907 amendment, enough cannot be realized upon the foreclosure sale to pay in full the consolidated mortgage bonds after satisfying the antecedent liens, and, as incidental to the question just stated, that the putting of such higher rates in force would directly benefit the consolidated mortgage bondholders. As to these questions, we think the burden of proof rests upon complainants.

The bill is framed largely upon the theory that the railroad company is entitled to earn a fair return upon its capital devoted to its intrastate passenger business, and that the statutory rates in question are practically confiscatory of that investment. It is obvious that such consolidated mortgage bondholders, being now interested only in realizing their mortgage debt, are not concerned with the sources of the railroad's income, except so far as such income is necessary to the collection in full of the mortgage debt; in other words, the bondholders cannot get relief by merely showing that passenger rates are confiscatory. If their mortgage is collectible in spite of the alleged confiscatory rates, they are not concerned with that question. The case differs from the West Virginia Passenger Fare Case, 236 U. S. 605, 35 Sup. Ct. 437, 59 L. Ed. 745, and the North Dakota Case, 236 U. S. 585, 35 Sup. Ct. 429, 59 L. Ed. 735.

Do the bill and affidavits allege that unless the existing statutory passenger rates are enjoined pending suit the consolidated mortgage bonds cannot be collected in full? The bill alleges that the "fair and present value of the physical properties" (exclusive of franchises and good will) of the entire Pere Marquette Railroad system is $78,545,-241, and of that part of the system in actual use for railroad purposes in the state of Michigan $68,609,709, and, further, that:

The "fair value of all the railroad properties, franchises, and assets of every description of the Pere Marquette in the state of Michigan, which are now being used for the convenience of the public, exceeds the said sum of $68,609,709, and that the fair value of the railroad properties, franchises, and assets of every description of the Pere Marquette Railroad system, which are now being used for the convenience of the public, exceeds said sum of $78,545,241."

Defendants urge that these allegations amount to an affirmative showing that the value of the railroad properties is more than sufficient to pay off the consolidated mortgage bonds and all antecedent lien; and, if this is so, complainants obviously have no right to the relief asked. We need not and do not decide this question, for we think the bill and affidavits, taken together, fail to make it sufficiently appear that without the injunction asked for the mortgaged property will not yield sufficient to meet the full payment of the consolidated mortgage bonds. While there is a showing that the entire railroad property has

for several years failed to realize a sufficient net return above operation to pay the interest upon the consolidated mortgage bonds and all prior obligations, there are no definite allegations bearing upon the issue whether the property will sell for enough to meet the bonds with which we are here concerned. This consideration is one of substance; for while defendants' motion to dismiss the application, and their failure to make counter showing of facts, amount to an admission, for the purposes of this hearing, of the allegations of the bill and affidavits, they amount to no more than that, and in view of defendants' insistence that the bill alleges the value of the railroad property to be sufficient to permit payment of the mortgage in question we cannot assume that defendants would admit the allegation that the consolidated mortgage is uncollectible without the injunction asked. These considerations, in our judgment, forbid the granting of the motion for injunction upon the present showing. We shall not, however, now formally deny it, but shall give plaintiffs an opportunity to amend their bill and supplement their showing, so far as they are able and may be advised, to meet the views we have expressed.

The case is an important one, both to the public and to the private financial interests involved, and we are not inclined to dispose of the application in the absence of the fullest showing of all pertinent facts. There are, however, a number of practical considerations which admonish us that injunction should not be granted unless actually and clearly necessary to plaintiffs' protection. Among these considerations is the fact that, while the purchaser at foreclosure sale may have the right to operate the road for a time at least without reincorporation under the existing law (and thus by a formal submission to the existing passenger rates), it is apparent that such indefinite operation is, as a practical proposition, likely to be more or less unsatisfactory; further, were relief to be granted, it could only be by insuring that the increased fares permitted by the pre-existing statute of 1889 (P. A. Mich. 1889, p. 282) be applied directly to the benefit of the consolidated mortgage and the precedent liens. Again, an order of sale in the receivership proceedings (as distinguished from the foreclosure proceeding) has already been entered, to take place in the coming autumn, and, if had at that time, any order we might make in the interest of the consolidated mortgage bondholders might prove futile. We do not, however, express any opinion as to whether these or other difficulties are insurmountable, but refer to them only as indicating the necessity of making reasonably sure that the temporary injunction, if granted, would bring substantial benefit to those alone rightfully concerned in it.

It follows from what we have said that, if complainants do not desire to take advantage of the permission for amendment, but see fit to stand upon their present showing, an order denying the motion for injunction will be presently entered.

## On Motion for Preliminary Injunction.

By our opinion filed August 5, 1915, we held (a) that the Pere Marquette Railroad Company, by virtue of its incorporation under the act

of 1907, is estopped to complain of the two-cent passenger fare provisions of the 1907 and 1911 amendments to the Michigan railroad law (P. A. Mich. 1907, p. 59; P. A. Mich. 1911, pp. 476–478) here assailed; (b) that the Farmers' Loan & Trust Company, as trustee under the consolidated mortgage, is the only party entitled in this suit to so complain; (c) that by electing to declare the mortgage and the bonds secured thereby immediately due and payable, and instituting foreclosure proceedings for their collection, the mortgage has become merely a present investment, whose value depends entirely upon the amount of money which may be realized from a present sale of the mortgaged property; (d) that if the mortgage is collectible in spite of the alleged confiscatory passenger rates the bondholders are not concerned with that question; (e) that plaintiffs have the burden of showing that the foreclosure sale will not realize enough to pay the consolidated mortgage bondholders in full; and (f) that it did not then sufficiently appear that, without putting into force the passenger fare provisions of the 1889 statute, the mortgaged property will not yield enough to pay those bonds in full. (The consolidated mortgage and all prior incumbrances, with interest, including receivers' certificates and notes, amount to less than $45,000,000.)

Complainant was given opportunity to amend its bill and supplement its showing, to meet, so far as it could, the views so announced. It is asserted in the amended and supplemental bill that the averments of the original bill respecting values of the railroad properties in Michigan and generally relate only to the values on which plaintiffs claim to be entitled to a fair return, and on which such return could be earned but for the alleged confiscatory passenger rates. A decree of foreclosure and sale under the consolidated mortgage has been made. It is alleged, however, in the amended and supplemental bill, that the existing passenger rate provision seriously affects the selling value of the railroad properties and seriously reduces the security of the consolidated mortgage, and, on information and belief, that unless such rate provision is enjoined the foreclosure sale will not bring enough in cash to pay the consolidated mortgage bonds in full, thus making it necessary that the bondholders thereunder, for their full protection, either bid in and reorganize the property or accept postponed securities, while, if permitted to receive a fair passenger rate, it is said, also on information and belief, that the foreclosure decree might be vacated and the consolidated mortgage continued as an investment, or the incumbrancers junior to the consolidated mortgage put in position to bid in the property and pay off the bonds secured by that mortgage.

Adhering, as we do, to our formerly expressed view that plaintiffs are in no event entitled to injunction unless it clearly appears that without it the foreclosure sale will not realize enough to pay the consolidated mortgage bonds after satisfying antecedent liens, the allegations in the amended and supplemental bill respecting the importance and value of an adequate passenger rate may be disregarded, except as they bear upon the ultimate question stated. It is also clear that

allegations merely by way of conclusion, or on information and belief, are not controlling of the facts.

Assuming, however (as seems likely), that a cash bid of $45,000,000 upon foreclosure sale is not to be expected, it does not follow that the consolidated mortgage bonds would not be paid in full through ability to market securities representing only a value upon which adequate returns are yielded. Indeed, it is unlikely that, with the old passenger rates restored, a cash bid of $45,000,000 could be obtained. A sale for cash is seldom made on railroad foreclosures. The necessity of protecting securities on such sales is not unusual.

[4, 5] Coming to the ultimate question: The rule is imperative that the operation of state statutes governing passenger rates should not be enjoined unless the confiscatory character of the rate is clear. This rule is specially applicable to injunctions before final hearing. Before granting injunction in this case we should be more sure that it is necessary to plaintiffs' protection, in view of the question (which we pass without decision) of plaintiffs' estoppel to complain of the rate, and considerations referred to in our former opinion (and not there or here passed upon) respecting the difficulties attendant upon an indefinite operation of the railroad without reincorporation under the existing law, of which the assailed rate is a part, and the segregation of the increased revenues for the benefit of plaintiffs, as well as the fact that the finding involved in the issue of injunction would naturally encourage reorganization investment, which might be disappointing if on final hearing injunction were denied. We need not now consider the efficacy of the provision in the foreclosure decree which attempts to give to the purchaser thereunder the right of action in this suit to attack the rate.

The receivers' report for the year ending June 30, 1915 (accessible since our former opinion), shows a net income of $1,006,012.17 after deducting operating expenses, taxes, hire of equipment ($609,074.00), rentals, and current interest on underlying bonds, receivers' certificates, receivers' notes, and bills payable; and after deducting the current year's interest ($99,365.80) on equipment obligations (whose principal now amounts to $2,515,132.27) a net income of $906,646.37 is shown, after paying interest accruing for the year on all incumbrances prior to the consolidated mortgage. This net income would thus pay in full the interest ($335,280) on the consolidated mortgage bonds (whose principal amounts to $8,382,000), and leave $571,366.37 available for interest on obligations *junior thereto* were it not for maturing principal on equipment obligations, principal of receivers' obligations, past-due bills payable, and arrears of interest on bonds, receivers' certificates and notes, and on bills payable, resulting from deficits in previous years' operations, including expenditures therein for new equipment, additions, and betterments.

By charging against this net income for the year 1915 $604,426.11 for maturing principal of equipment obligations, together with interest on matured and unpaid principal thereof, as well as interest on matured unpaid interest on prior bonds, plaintiffs' computation shows a deficiency on account of consolidated mortgage bond interest of

$223,412.56; that is to say, but $111,867.44 is left so available, instead of the required $335,280. But the record does not make it clear how much, for example, of the item of $604,426.11 paid as for maturing principal on equipment obligations is properly chargeable as an expense of the year 1915, for the purpose of determining net profits from operation or the income-yielding value of the railroad; and we are not prepared to say that on the basis of that year's operation the road did not earn a fair net income on an investment of $45,000,000. Unless, then, the operation for the year 1915 was abnormally profitable, a threatened confiscation of plaintiffs' property, or any part of it under existing passenger rates does not so clearly appear as to warrant injunction. We are not satisfied that the operation for that year was abnormally profitable, or, if more than normally profitable, was so much in excess of a normal return as to appreciably affect the value of plaintiffs' investment.

For the years 1907–1910, both inclusive, taking into account a comparatively small deficit for 1908, there was an average annual surplus of $137,229.99, after payment of operating expenses, taxes, rentals, hire of equipment, and interest accruals on all indebtedness; such surplus for 1910 being $469,713.69. True, there was for each of the years 1911–1913, both inclusive, an average balance of but $1,528,-237.51 available for payment of interest, leaving an annual average deficit of $1,796,330.31, which deficit in 1914 was $7,152,894.75. But that the year 1914 was abnormally unprofitable, that the year 1915 makes a showing not substantially better than normal, and that the deficit for 1915 was due largely to the increased interest charges resulting from deficits created during the years immediately preceding, all seem to be fairly indicated by the facts that for the year 1915, while the gross revenues were only between 6 and 7 per cent. greater than in 1914 (and apparently not more than 6 per cent. greater than the average for 1910 to 1914, both inclusive), the balance before deduction for interest accruals was $2,888,279.78 (which was only 11 per cent. less than the entire of the average interest on funded debt accruing during the years 1910 to 1913, inclusive, and in fact a trifle more than the average interest accruing during the years 1907 to 1909, inclusive), this deficit for 1915 being only $1,419,264.53, although the interest accrual account ($4,307,544.31) was $982,976.49 greater than the average of that account from 1911 to 1913, and the funded debt had increased $5,000,000 since 1913. This deficit for 1915 seems to be less than the interest on the $40,000,000 excess of present funded indebtedness over the $45,000,000 required to include the consolidated mortgage bonds. The significant feature of the 1915 operation was the reduction (apparently due to careful management) of the operating expense ratio from more than 106 per cent. in 1914 [1] to less than 75 per cent. in 1915; such operating expense being less both in ratio and in the aggregate than for any year since 1910.

While the proof of the collectibility of the consolidated bonds, in the

---

[1] The 1914 operating expenses account included, however, items aggregating more than $2,200,000, accumulated in large part, at least, during previous years.

absence of the injunction asked for does not amount to a demonstration, in our opinion it does not clearly appear affirmatively that without the aid of the injunction asked for those bondholders are threatened with a confiscation of their investment in whole or in part. In other words, we are not clearly satisfied that the railroad is not now earning and will not continue to earn a fair return upon an investment represented by a funded debt of $45,000,000 (as against the present $85,000,000) when the necessity of using current income for principal of receivers' obligations and other maturing debts is removed.

We are therefore constrained to deny the preliminary injunction; and it will be so ordered.