NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY
*vs.*
PUBLIC UTILITIES COMMISSION

Kennebec.    Opinion, January 27, 1953.

*Locke, Campbell, Reid & Hebert,*
*James L. Reid,*
*Hutchinson, Pierce, Atwood & Scribner,*
*William M. Hogan, Jr.,*
> Attorneys for New England Telephone and
> Telegraph Company.

*John M. Gepson,* of Counsel.
*Alexander A. LaFleur, Attorney General,*
*Ernest L. Goodspeed, Asst. Attorney General,*
> for the State of Maine.

*A. F. Martin,* Attorney for the City of Lewiston.

SITTING: MURCHIE, C. J., THAXTER, FELLOWS, MERRILL, NULTY. (WILLIAMSON, J., did not sit.)

THAXTER, J. This complaint was filed November 30, 1950 in accordance with R. S., 1944, Chap. 40, and particularly under the provisions of section 61 of that chapter. It alleges that the Public Utilities Commission of Maine has jurisdiction over the operations of the Telephone Company within the State of Maine; that its rates are not now reasonable and just taking into consideration the fair value of its property devoted to intrastate telephone service with a fair return thereon; that such rates unless increased will continue to be unjust, unreasonable and insufficient, in that revenues and net earnings will continue to be insufficient to yield a fair return. And more particularly the Company points out that there have been substantial increases in its operating expenses due in part to economic changes attend-

ing the Korean war and the country's rearmament program, increased wages, and increased taxes; that the Company must make additional expenditures to its plant to maintain, extend and improve its service; and that its credit has already begun to suffer due in part to these conditions and to its inability to earn a fair return on the fair value of its property devoted to the public service within the State of Maine. The Company asks that the Commission investigate its rate structure for intrastate business for the purpose of remedying these conditions. Findings of fact were requested from the Commission, including findings "as to the fair value of Respondent's property devoted to the public use, the rate of return thereon allowed, and its income and operating expenses."

The Company in 1948 had filed with the Public Utilities Commission and in accordance with the provisions of R. S., 1944, Chap. 40, Sec. 73, a petition, No. 1316, praying for emergency relief in the form of an order authorizing an interim increase in rates pending disposition of an entirely new schedule. A thorough investigation was made by the Commission on that complaint; and extensive findings were made. The Commission cancelled certain of the proposed rates which had been filed by the Company; accepted others subject to some amendments; and the Company proceeded to operate under the new schedule of rates ordered and approved by the Commission. According to the contention of the present petition the Company found, however, that costs were still rising and that under the decree of the Commission it was unable to earn a fair return on the fair value of its property used in intrastate service. Accordingly, on November 30, 1950, the present complaint, No. 1370, was filed praying for a further investigation and hearing and that reasonable earnings be allowed to provide a fair return on the fair value of its property devoted to the public service in the State of Maine. Such hearing was had and on

May 19, 1952 an order was filed by the Commission that this new complaint be dismissed. In this case, as in the preceding one, Commissioner Hill dissented. By agreement of counsel the record and order in the earlier case, No. 1316, are made a part of the record in this.

Exceptions to the decree of the Commission were filed by the Telephone Company and the case is before us on these exceptions.

The Commission is the judge of the facts in rate cases such as this. This court under the statute which created it is only a court to decide questions of law. It must be so, for it has not at its disposal the engineering and the technical skill to decide questions of fact which were wisely left within the province of the Commission. Only when the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution, can this court intervene. Then the question becomes one of law. We cannot review the Commission's findings of fact and seek to determine what rates are reasonable and just. When the Commission decides a case before it without evidence, or on inadmissible evidence, or improperly interprets the evidence before it, then the question becomes one of law. The rule is the same as in hearings on appeals from the Industrial Accident Commission. *Hinckley's* Case, 136 Me. 403.

The exceptions are ten in number.

Exception 1 is to the order of the Commission dismissing the petition of the Company, and alleges that such order or decree of dismissal compels the Company to provide service at rates which are insufficient to yield a fair return on the fair value of its property used in providing service within the State of Maine.

Exception 2 is to the refusal of the Commission to consider current costs in figuring the rate base for determining

the fair value of the Company's property used in furnishing intrastate service in Maine.

Exception 4 is substantially to the same effect as Exception 2 and alleges that the ruling of the Commission referred to in such exception does not take into consideration the fair value of the Company's property used in furnishing intrastate service in Maine and does not provide a fair return on such property.

The other exceptions which will be considered hereafter are to certain specific rulings on subsidiary points in which it is declared that the same error to consider fair value appears in each specific instance or that there is an apparent error in figuring net earnings either in including or excluding relevant evidence as to value of the Company's property devoted to public service within the State of Maine, or that certain expenses for service within Maine are wrongfully excluded.

In short, all these ten exceptions raise questions of law, the main complaint being that the Commission has failed to follow the mandate of the statute in its refusal to give consideration to the evidence of the present fair value of the Company's property as required by sections 16 and 17 of R. S., 1944, Chap. 40. These sections read as follows:

"**Sec. 16. Public utility to furnish safe and reasonable facilities; charges to be reasonable and just. R. S. c. 62, § 16.** Every public utility is required to furnish safe, reasonable, and adequate facilities. The rate, toll, or charge, or any joint rate made, exacted, demanded, or collected by any public utility for the conveyance or transportation of persons or property between points within this state, or for any heat, light, water, or power produced, transmitted, delivered, or furnished, or for any telephone or telegraph message conveyed, or for any service rendered or to be rendered in connection with any public utility, shall be reason-

able and just, taking into due consideration the fair value of all its property with a fair return thereon, its rights and plant as a going concern, business risk, and depreciation. Every unjust or unreasonable charge for such service is prohibited and declared unlawful.

"**Sec. 17. Valuation of property to be made if necessary for fixing rates. R. S. c. 62, § 40.** The commission shall fix a reasonable value upon all the property of any public utility used or required to be used in its service to the public within the state whenever it deems a valuation thereof to be necessary for the fixing of fair and reasonable rates, tolls, and charges; and in making such valuation it may avail itself of any reports, records, or other information available to it in the office of any state officer or board."

The Commission not only receives its authority from the Maine statute but is bound by the provisions of the state and federal constitutions which forbid the taking of private property without just compensation. Constitution of Maine, Article I, Sec. 21; Constitution of the United States, Amendments, Articles V. and XIV. It is unnecessary to discuss these overriding constitutional provisions because, as we have before said, the Maine Public Utilities Commission is a creature of statute and bound to act in accordance with the statute which created it. This, as the exceptions before us point out, it has not done. Without expressing any opinion on the constitutional questions here involved, if there are any, we shall discuss these exceptions. These allege in general that the Commission in establishing and approving rates for telephone service within the State of Maine has not followed the statutory mandate, particularly in that it did not give due consideration to the fair value of the Company's property within the State of Maine with a fair return thereon. Of the three commissioners, Commissioner Hill in an able opinion dissented.

## EXCEPTION 1.

The record in this case shows that the Telephone Company, which is the complainant in this case, is a New York corporation doing business in Maine, New Hampshire, Massachusetts, Vermont and Rhode Island, and is subject to the jurisdiction of the Public Utilities Commission of the State of Maine insofar as its intrastate traffic in Maine is concerned. It is one of the component parts of the American Telephone & Telegraph system and is physically interconnected with the other companies of such system. The stocks of the companies comprising this vast enterprise are controlled by said American company, together with the stocks of certain corporations which manufacture supplies and do research work for the system as a whole. Its services beyond the State of Maine are under the control of the Federal Communications Commission and of the various regulatory bodies in the states through which the companies in the system and the American company itself operate. The Maine Public Utilities Commission and this court have jurisdiction over the New England company so far as its services are rendered solely within this state. It is only necessary to mention this set-up to understand the complexity of the situation here involved; for example, the equipment such as exchanges and telephone lines are used in common by the New England company for intrastate traffic and by the system generally for interstate traffic. What proportion of the revenues from all traffic, both intrastate and interstate, belongs to the complainant, and what proportion of the expense of the joint operation should be borne by it, are exceedingly complicated questions. Furthermore, the system of accounting is prescribed by federal law and is under the control of the Federal Communications Commission, and no other accounts can lawfully be kept. Of necessity, therefore, there must be some uniformity of operations and accounting within the different jurisdic-

tions. The problem of apportioning such receipts and expenses is known as "separations," which is a word used by those having this matter before them for solution, be they scientists, accountants, or lawyers. Various formulas have been proposed for the solution of the matter, known by various names; but the art is still in a nebulous state. We should bear in mind the warning of Justice Hughes in the *Minnesota Rate Cases (Simpson v. Shepard)* 230 U. S. 352, 57 L. Ed. 1511, at page 1556, in discussing the fair value of the property used for the convenience of the public that the "ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment, having its basis in a proper consideration of all relevant facts."

The Commission must find the fair value of the Company's property devoted to the public service within this state before it can determine what rates will yield a fair return on the fair value of such property. The first exception alleges that the findings of fact of the Commission, on which the decree of dismissal of the complaint was based, not only compelled the Company to furnish service at rates insufficient to provide a fair return on the fair value of its property used in providing intrastate service, but the gist of the Company's argument is that the Commission deliberately refused to find the fair value. We shall address ourselves in the first place to these two matters: (1) What are the elements determining fair value? (2) Did the Commission refuse to find it?

Fair value has been considered by the courts of this state many times. One of the essential elements has been said to be "the right of the company to derive a fair income, based upon the fair value of the property at the time it is being used for the public, taking into account the cost of maintenance or depreciation, and current operating expenses; and, on the other hand, the right of the public to have no more

exacted than the services in themselves are worth." We wish to emphasize that it is the "fair value" of the property at the time it is being used for the public. *Kennebec Water District* v. *City of Waterville,* 97 Me. 185, 204. And again the same court says in the same case at page 207: "The plaintiff, in request 2, asks that the actual cost of the plant and property together with proper allowances for depreciation be declared to be legal and competent evidence upon the question of the present value of the same. We so hold, It is competent evidence, but it is not conclusive. It is not a controlling criterion of value, but it is evidence. *National Water Works Co.* v. *Kansas City,* 62 Fed. Rep. 853, 27 L. R. A. 827; *Smyth* v. *Ames, supra; San Diego Land Co.* v. *National City, supra; Cotting* v. *Kansas City Stock Yards Co., supra; West Chester Turnpike* v. *West Chester County,* 182 Pa. St. 40; *Griffin* v. *Goldsboro Water Co.,* 122 N. C. 206, 41 L. R. A. 240. Of course this element is subject to inquiry as to whether the works were built prudently, and whether they were built when prevailing prices were high, so that actual cost, in such respects, may exceed present value. *Reagan* v. *Farmers Loan & Trust Co.,* 154 U. S. 362; *San Diego Land & Town Co.* v. *National City,* 174 U. S. 739." We think that these two comments point out clearly that fair value means present value and that original cost is but one of several criteria of such value.

This court said the same thing in *Brunswick and Topsham Water District* v. *Maine Water Company,* 99 Me. 371, page 379: "In determining what would be a fair return, undoubtedly, the amount of money actually and wisely expended is a primary consideration. Actual cost bears upon reasonableness of rates, as well as upon the present value of the structure as such. It thus bears upon what is a fair return upon the investment, and so upon the value of the property. In estimating structure value, prior cost is not the only criterion of present value, and present value is what is

to be ascertained. The present value may be affected by the rise or fall of prices of materials. If in such way the present value of the structure is greater than the cost, the company is entitled to the benefit of it. If less than the cost, the company must lose it. And the same factors should be considered in estimating the reasonableness of returns."

Such opinions of nearly half a century ago undoubtedly formed the basis for the early decisions of our first Public Utilities Commission and those of the various commissions which have followed it since down to the time when the present commission seems to have pronounced a different doctrine of its own. We are indebted to the brief of complainant's counsel for the following quotations from the unreported opinion of one of these early commissions composed of Commissioners Cleaves, Skelton and Bunker, in the case of *Hines* v. *Lewiston Gas & Light,* F. C. 56, on January 18, 1918:

    " 'This Commission has in all rate cases taken the present value of the property to be the value upon which the utility is entitled to a fair return. Usually, it has ascertained this value by finding the cost of reproduction new less depreciation. In the case of Butler et als. vs. Lewiston, Augusta & Waterville Street Railway, Me. P.U.C. Rep. 1916, 100, P.U.R. 1916, D 25, it adopted the original cost as the measure of value on which a return might be enjoyed.

    " 'That case has been cited as committing the Commission to the theory that the original cost of a property is its value for rate making purposes; and some statements in the decision, given as reasons for not making an independent physical valuation; standing alone, appear to justify such a conclusion. They were, however, intended to explain why that evidence alone, in a case like that then under discussion, taking into consideration the comparatively recent date of construction and the condition of the utility's accounts, why such evi-

dence alone was sufficient on which to base an appraisal.

" 'The law says that the rate shall be fair taking into consideration the fair value of the property. When authorities quit theorizing, or trying to reach preconceived conclusions, they come very near agreeing that "fair value" means what everybody thinks it means—not what it first cost, but what you can get one like it for now.

" 'Here follow the quotations from the opinions of Judge Savage in the two Maine cases (quoted, p. 25, supra) and from the opinions of the Supreme Court of the United States in *Consolidated Gas Co.* v. *Willcox and Minnesota Rate Cases*, likewise above quoted.)

" 'It is clear that in ascertaining the present value we are not limited to the consideration of the amount of the actual investment. If that has been reckless or improvident, losses may be sustained which the community does not underwrite. As the company may not be protected in its actual investment, if the value of its property be plainly less, so the making of a just return for the use of the property involves the recognition of its fair value if it be more than it cost.

" 'Whatever may be the merits of the respective theories, and there are very plausible arguments and eminent support for both, we are not satisfied that we should disregard the rulings of the highest court of our State, or those of the highest court in the nation spoken finally by no less an authority than Justice Hughes; nor undertake to hold that when the legislature said "value" it meant "investment".' "

From then to the present time such construction of the words "fair value" has been approved by the Supreme Judicial Court of this state.

In the case of *Gay* v. *Damariscotta-Newcastle Water Co.*, 131 Me. 304, the public utility petitioned for an increase in

hydrant rentals. The commission disallowed the increase but in doing so pointed out that it had made an appraisal of the company's plant in which it had considered the original investment "in the light of changes in costs of labor and supplies." Thereby this court inferentially at least gave approval to the doctrine that reproduction cost less depreciation was one of the important elements which should be considered in determining fair value.

*Rockland* v. *Camden and Rockland Water Co.*, 134 Me. 95, was a rate case in which the following rule was laid down, page 97:

> " 'The rate . . . shall be reasonable and just, taking into due consideration the fair value of all its property with a fair return thereon, . . . .' R. S., *supra*, (Sec. 16).

> "Such is the fair value concept, better called the rate base."

*Sweet* v. *City of Auburn*, 134 Me. 28, was the case of a petition for tax abatement. This court said as to value page 32:

> "If, during a time of crisis, it is impossible to determine the true worth of real estate by reference to the price which such property will bring in the market, resort may be had to other factors. Consideration may be given to the original cost of construction less depreciation, although perhaps this is less important than other things, to reproduction cost with an allowance for depreciation, to the purchase price, if not sold under stress or unusual conditions, to its capacity to earn money for its owner. No one of these elements is controlling, but each has its place in estimating value for purposes of taxation. *Spear* v. *City of Bath, supra; Central Realty Co.* v. *Board of Review, supra; Underwood Typewriter Co.* v. *City of Hartford,* 99 Conn., 329, 122 A. 91; *Massachusetts General Hospital* v. *Inhabitants of Belmont,* 233 Mass., 190, 124 N. E., 21; *Somers* v. *City of Meriden, supra;* 2 Cooley, Taxation (4 ed.), 1147."

And again at page 34, referring to certain opinion testimony as to value, it is said:

> "Such in brief is the testimony which the petitioner claims shows an over-valuation of this property. It does not, however, tell the whole story. The original cost, measured by a scale of prices of a score of years ago, may throw some light on the problem but is of minor significance. Neither is the purchase price at the receiver's sale of great consequence. The property changed hands during the depths of a depression at a time when, to say the least, it was difficult to find purchasers who could finance so large an enterprise. That the petitioner was able to buy it at that time for $100,000 is of small moment."

And in *Damariscotta Newcastle Water Co.* v. *Itself,* 134 Me. 349, we were seeking to find the elements which make up value and we specifically approved a finding of the Public Utilities Commission of a rate base for a water company of $140,000. This amount was $40,000 more than the original cost. The commission said:

> " 'After careful consideration of all the elements presented in this case and analysis of the affairs of this company and its predecessors as introduced in evidence, including original cost, outstanding securities, reproduction cost and reproduction cost less depreciation, and the economic condition of these communities and municipalities as shown by the testimony, we conclude that the fair value of the company's property as a going concern including a reasonable amount for cash working capital, is $140,000, which we shall adopt as the rate base in this case.' "

To the same general effect as these opinions of this court are the following from other states in which the doctrine of "fair value" is discussed. *Pittsburgh* v. *Pennsylvania Public Utility Commission* (Pa. Supreme Court 1945) 44 A. (2nd) 614; *Havre De Grace & Perryville Bridge Co.* v. *Pub-*

*lic Service Commission of Maryland,* 132 Md. 16, 103 A. 319: *East Ohio Gas Co.* v. *Public Utilities Commission of Ohio* (Supreme Ct. Ohio 1938) 12 N. E. (2nd) 765; *Tobacco River Power Co.* v. *Public Service Commission* (Supreme Ct. Mont. 1940) 98 P. (2nd) 886. In the *Maryland* case cited *supra,* the court said, page 29:

> "The real point to be ascertained was not what it had cost either the railroad company to build the bridge, or the incorporators of the Bridge Company to acquire it, but what was its fair value at the time of the investigation by the Commission."

To the same effect also is the following language of Justice Hughes of the Supreme Court of the United States in the *Minnesota Rate Cases, supra,* 57 L. Ed. 1511, 1556:

> "The basis of calculation is the 'fair value of the property' used for the convenience of the public. Smyth v. Ames, 169 U.S. 546, 42 L. ed. 849, 18 Sup. Ct. Rep. 418. Or, as it was put in San Diego Land & Town Co. v. National City, 174 U. S. 757, 43 L. ed. 1161, 19 Sup. Ct. Rep. 804; 'What the company is entitled to demand, in order that it may have just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public.' "
> *****

> "The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment, having its basis in a proper consideration of all relevant facts. The scope of the inquiry was thus broadly described in Smyth v. Ames (169 U. S. pp. 546, 547) : 'In order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present, as compared with the original, cost of construction, the probable earning capacity of the property under particular rates prescribed by stat-

ute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth.' "

We must bear in mind that federal courts are not bound by statute as the courts of our own state are to consider the fair value of the utility property in determining the rate base on which a return should be allowed. North Dakota recognizes that a different rule is applied by federal and state courts and the court there points out that the commission must determine fair value which must include consideration of evidence of increase in value of assets over the amount originally invested in the property. The evidence of reproduction cost less depreciation is one of the major factors which must be considered by the commission reaching its conclusion. *Northern States Power Co.* v. *Board of Railroad Commissioners,* 71 N. D. 1; *Northern States Power Co.* v. *Public Service Commission* (N. D. 1944), 13 N. W. (2nd) 779. The failure to consider evidence of a fair value is an error of law which can properly be brought before this court on exceptions.

We do not need to examine the record to determine that the Maine Public Utilities Commission did not do what the statute required it to do, for the Commission admits that it has not done so. What other conclusion can be drawn from its opinion where it gives the following reasons for not doing so?

"A main objection to 'current costs' is the lack of definiteness and stability. Such prices are mov-

ing up and down with a frequency that a change of rates to keep pace would be impracticable."

We do not expect the impossible, and mathematical accuracy is not required. See Justice Hughes' opinion in the case of *Smith* v. *Illinois Bell Telephone Co.*, 282 U. S. 133, 75 L. Ed. 255, at page 264, wherein he says, after pointing out many of the same difficulties which perplexed our own Public Utilities Commission:

"While the difficulty in making an exact apportionment of the property is apparent, and extreme nicety is not required, only reasonable measures being essential (Rowland v. Boyle, 244 U. S. 106, 108, 61 L. ed. 1022, 1023, P.U.R. 1917E, 685, 37 S. Ct. 577; Groesbeck v. Duluth, S.S.&A.R. Co. 250 U.S. 607, 614, 63 L. ed. 1167, 1172, P.U.R. 1920A, 177, 40 S. Ct. 38) it is quite another matter to ignore altogether the actual uses to which the property is put. It is obvious that, unless an apportionment is made, the intrastate service to which the exchange property is allocated will bear an undue burden—to what extent is a matter of controversy."

Also the language of Justice Hughes in the *Minnesota Rate Cases, supra,* heretofore quoted, should at all times be borne in mind by our own Maine Public Utilities Commission. And see our own language as to value in *Sweet* v. *City of Auburn, supra.*

Particularly pertinent is the language of Justice Hughes where he says further, 57 L. Ed. 1555: "It is for Congress to determine, within the limits of its constitutional authority over interstate commerce and its instruments the measure of the regulation it should supply. It is the function of this court to interpret and apply the law already enacted, but not, under the guise of construction, to provide a more comprehensive scheme of regulation than Congress has decided upon." And so we might add it is not the province of the Maine Public Utilities Commission to adopt a dif-

ferent rule for measuring values than that which the legislature has declared. In interpreting legislation such as this we are the servant of the legislature and of the people of this state. We do not make the law. The Maine Public Utilities Commission has in this instance transgressed its functions and has gone beyond the limit of what it was authorized to do. This exception raises a fundamental issue of law and must be sustained.

## EXCEPTION 2.

"The Company has evidenced to us in several exhibits that the average net investment on December 31, 1951 was $36,103,100 which includes working capital of $1,655,000. The average net investment in property would therefore be $34,448,100. In all its computations for different rates of return ($6\frac{1}{2}\%$ and $7\frac{1}{2}\%$) the Company has used the foregoing base.

"The Company has requested the Commission to increase this figure by some amount to reflect 'current costs.' The majority of the Commission find no valid reason to alter the opinion expressed in the prior case, F. C. #1316, September 14, 1949 (80 PNS 397) and finds no necessity for restating the position there set forth. A main objection to 'current costs' is the lack of definiteness and stability. Such prices are moving up and down with a frequency that a change of rates to keep pace would be impracticable. Current cost represents in terms of today's dollars, what it would have cost to build the plant as it was built over a period of many years. If the Company were confronted with the necessity of building with current dollars its plant in Maine, it is safe to say that many changes would be made, notably in our many 'crank' phones, and the magnitude of these and other changes would be such as to afford no valid basis of comparison between such a plant and the present plant. By using 'current costs' of plant, the Company is apparently striving to get along

with a lower rate of return, but not less income, an attempt we do not subscribe to.

"Complainant alleges that it is aggrieved by said finding and ruling and that its rights are substantially prejudiced thereby in that said finding and ruling does not take into due consideration the fair value of all complainant's property used in furnishing intrastate service in Maine."

This exception raises the same question as does Exception 1. The Commission in its rulings must abide by the statute, and must in establishing its rate base recognize current costs both insofar as those costs affect the fair value of its plant within the State of Maine and the operation of it. The Company is entitled to have determined as its rate base the fair value of its plant and equipment, together with the value of its net working capital. It makes no difference that such figure may be more or less than the average net investment even though that may have been the rate base on which the Company had based its figures previously. This exception must be sustained.

#### EXCEPTION 3.

This exception is to a ruling of the Public Utilities Commission expressed in the following language in its opinion:

"By using the foregoing, in so far as the SLU factor is concerned, increasing the holding time of toll, decreasing exchange holding time and increasing its traffic units and applying a factor of 3, we get a SLU factor of 10.8563. That multiplied by the property subject to SLU gives $2,498,200 to be transferred to interstate. The transfer of this property carries with it $549,600 of expense.

"In a similar manner there is $2,996,900 of plant affected by Traffic Units in allocation. By increasing the traffic units to reflect actual interstate use, $299,700 of property is transferred and $29,900 of expense.

"According to evidence submitted by the Company, a change in the traffic coefficients means a transfer of $98,000 of property to interstate account and its concomitant of $66,000 expense. The three foregoing transfers of property and expenses to interstate seem to be entirely justified, equitable and reasonable.

"Having made these changes in property, a new rate base results, in place of the $35,200,000 previously referred to, on net investment plus working capital and materials and supplies, of $32,302,200. Using the estimated increase in wages annualized at $412,000, the increase in Federal Income Tax of 52% and giving effect to the transfer of expenses, the Company on 1951 figures will be earning on an estimated income of $15,103,700, approximately $1,931,000 on Maine intrastate plant as against $2,100,000 on a full 6½% return. Expenses not including Federal Income Tax are computed at $12,127,200.

"Complainant alleges that it is aggrieved by said findings and rulings and that its rights are substantially prejudiced thereby in that said findings and rulings (a) wrongfully determine the fair value of complainant's property used in furnishing intrastate service in Maine (b) exclude substantial amounts of complainant's property used in furnishing intrastate service in Maine and (c) exclude substantial amounts of expense incurred by complainant in providing intrastate service in Maine and hence erroneously determine that complainant's earnings are higher than they are in fact."

The exceptant claims to have been aggrieved by this ruling in the following particulars: (1) that the fair value of the Company's property used in intrastate service in Maine is wrongfully determined; (2) that substantial amounts of the Company's property used in furnishing intrastate service in Maine have been excluded; and (3) that substantial amounts of expense in providing intrastate service have been omitted; and that because of these last

two errors, the complainant's true earnings from service within Maine appear to be much higher than they actually are in fact.

As to the first ground of grievance we can say only that the fair value of the Company's property within Maine is not merely erroneously determined. That value has not been determined at all. The Commission found as its rate basis not the fair value but, to use its own words, the "net investment plus working capital and materials and supplies." In determining that this exception must be sustained we do not need to say more, particularly as the values herein enumerated must be refigured. We might add, however, that values do not become proper merely because they conform to the Phoenix Plan, the Charleston Plan, or to those of some other manual. The sole issue is whether they conform to the statutes of Maine. This exception must be sustained.

### EXCEPTION 4.

Exception 4 is as follows:

> "It is our considered opinion that approximately 6.5% return on net investment including working capital and materials and supplies is fair and reasonable to the Company and to the customer.
>
> "Complainant alleges that it is aggrieved by said finding and ruling and that its rights are substantially prejudiced thereby for the reason that said finding and ruling does not take into due consideration the fair value of all complainant's property used in furnishing intrastate service in Maine with a fair return thereon."

What we have said before, particularly with respect to exceptions 1, 2 and 3, applies here. The rate of return may be correct; but it is figured on a base which represents "net investment" and not "fair value." If fair value is less than net investment, the public is paying too much for the ser-

vice rendered; if fair value is more than net investment, the Company may not be receiving as much as it is entitled to have. This exception is sustained.

## EXCEPTION 5.

This exception reads as follows:

> "It is therefore our opinion that earnings after the adjustments are made are not out of line and are fair, just and reasonable.

> "Complainant alleges that it is aggrieved by said finding and ruling and that its rights are substantially prejudiced thereby in that said earnings are not earnings in fact being received by the Company and such erroneous determination of such earnings forms the basis of an erroneous finding and ruling as to the fair return being received by the Company."

What the Company says, as we view it, is that it is not only entitled to an income based on a reasonable return on the fair value of its property devoted to the public service within Maine, but that in figuring such fair return it is entitled to deduct the expenses of operating its plant within this state. The problem of allocating these expenses between interstate use and intrastate use is a real one; for the plant and equipment of the Company are used in common for both services. The seeming confusion grows out of our form of government under which Maine as other states has control of operations within the state, and the federal government through the Federal Communications Commission has jurisdiction over operations which go beyond the borders of the state. Justice Hughes, speaking for a unanimous court in the *Minnesota Rate Cases, supra,* laid down the principal standard for apportioning expense as that of the relative use of the facilities and equipment employed in the two services, interstate and intrastate service.

After a careful reading of the opinion and findings of the Maine Public Utilities Commission in both cases, No. 1316

and No. 1370, we are convinced that the majority of this Commission disregarded this factor which the Supreme Court and many state courts have held to be the most important element of all in applying separations. This exception by the Company was well taken and must be sustained.

## EXCEPTION 6.

This exception reads as follows:

"We would take the holding time in August and apply it to a year's messages. We have repeatedly given our reason for using August holding times instead of March. No valid reason has been given by the Company for using March figures. Company tries to claim it makes no difference. If it doesn't, no harm can result in applying August holding times. To reiterate, LDI lines are 'engineered' for peak use which comes in August (barring Aroostook County). During August the holding times are longer, the traffic units are larger, the number of interstate calls is the highest than at any time in the year. It therefore necessarily follows that in August the largest amount of property is devoted to interstate use. This property so devoted consists of at least two general kinds, without going into too many details. There is the LDI plant belonging to A.T.&T. for instance. Unless that plant is connected to subscribers for use it is valueless. There is the subscribers' plant that is allocated on a use basis to LDI use—interstate and intrastate. When such subscribers' property becomes a part of interstate LDI use, it is the same as if built for that purpose. It can no more be reallocated to intrastate use, to be supported by intrastate customers, than the LDI property can be reassigned to intrastate use.

"Complainant alleges that it is aggrieved by said finding and ruling and that its rights are substantially prejudiced thereby in that said finding and ruling forms the basis for an erroneous exclusion of complainant's property used in providing intrastate

service in Maine and forms the basis for an erroneous exclusion or disallowance of expenses reasonably incurred in providing intrastate service in Maine and hence leads to an erroneous and unlawful determination of earnings and return being received by complainant."

The Commission was concerned here with what portion of the plant of the Company was properly allotted to intrastate service in Maine; also what portion of the expenses should be charged to the operation of it. We have stated before that the only proper way to decide these questions is to determine them on the basis of the relative use of the plant in the two services, intrastate and interstate. As was acknowledged by Chief Justice Hughes in *Smith* v. *Illinois Bell Telephone Co., supra,* the problem is a difficult one and exactness cannot be expected in the solution of it. It is all the more important because it is a jurisdictional question; and must be decided broadly after giving due consideration to the rulings of the federal authorities on the same point. Otherwise chaos will result, particularly if the Commission gives undue consideration to the result to be achieved rather than to the proper and scientific methods of arriving at such result. The Company contends that the Commission has given too much stress to the subscribers' line usage factor, and has weighted that factor so that it shows a greater usage of plant in interstate service than is warranted, also that too large amounts of expense have been apportioned to such service. In such a way the net earnings from intrastate service appear larger than they really are. As the rulings of the Commission on this point are prejudicial to the Company, and unsupported by the evidence, the exception is sustained.

## EXCEPTION 7.

This exception reads as follows:

"Because the toll circuits are 'tailored' on August business, because the highest percentage of

LDI calls with respect to all originating calls occurs in August, in fairness to the Maine customer, to New England Company and to A.T.&T. Company, it is our opinion that August business should determine the holding time and not other months when the per cent of LDI is low.

"Complainant alleges that it is aggrieved by said finding and ruling and that its rights are substantially prejudiced thereby in that said finding and ruling forms the basis for an erroneous exclusion of complainant's property used in providing intrastate service in Maine and forms the basis for an erroneous exclusion or disallowance of expenses reasonably incurred in providing intrastate service in Maine and hence leads to an erroneous and unlawful determination of earnings and return being received by complainant."

We have already said that the solution of the separations problem hinges on the relative use of the plant and the lines of the Company in Maine between interstate traffic and intrastate traffic. Justice Hughes says in the *Minnesota Rate Cases, supra,* 57 L. Ed., page 1566: "That is, there should be assigned to each business that proportion of the total value of the property which will correspond to the extent of its employment in that business." So also there must be a division of expenses and these should be apportioned on the same basis of relative use. What the Commission has done is to take the month of August as typical of the entire yearly service because, to use its own words, "the highest percentage of the LDI calls with respect to all originating calls occur in August." In this manner an undue proportion of the expense of operation is thrown into interstate use, and it would appear that the intrastate service is not bearing its just proportion of expenses. This appears to be another case where the Commission was apparently concerned with what the result would be, instead of the proper method of arriving at such result. Likewise the Commission is confusing the number of LDI originating

calls with the length of time consumed in completing such calls. This exception is sustained.

### EXCEPTION 8.

This exception reads as follows:

> "The problem is for the Commission to find the usage of plant. Using any thing less than the peak means that plant constructed for peak usage has to be supported by someone other than toll rate payers during off peak periods. It is our considered judgment that peak holding time and traffic units during those holding times should govern in making the separation.

> "Complainant alleges that it is aggrieved by said finding and ruling and that its rights are substantially prejudiced thereby in that said finding and ruling forms the basis for an erroneous exclusion of complainant's property used in providing intrastate service in Maine and forms the basis for an erroneous exclusion or disallowance of expenses reasonably incurred in providing intrastate service in Maine and hence leads to an erroneous and unlawful determination of earnings and return being received by complainant."

What we have said in discussing Exception 7 applies here. The Commission seems to have been concerned with throwing the largest amount of expense of operation on interstate traffic as possible. In this way, to the prejudice of the Company, earnings from intrastate operations appear larger than they really are and the need for extra income less than it really is. This exception is sustained.

### EXCEPTION 9.

This exception reads as follows:

> "Furthermore, the Company's method of working the Separations Manual disregards all factors

except actual use. Our objections to this were stated in F.C. 1316 reported in 80 PNS at 409. We still adhere to the opinions there expressed and do not see how so called 'free' calls can be treated equally with 'pay' calls. For the monthly charge one can use an indefinite number of local calls and no other charge is made. If he calls outside the exchange area, each call requires a payment. In the case just referred to, the Commission applied a factor of 2 to the station component to attempt at equalization and fair comparison. This was a minimum figure.

"Mr. Tozier in the previous case (F.C. 1316) had stated that the calling rate might triple if a 10¢ rate were removed and calls to that 10¢ area became unrestricted. Mr. Upton agreed, and he was 'Market Engineer' for the Company, had been with it 17 years, serving in the Commercial Depart as a Traffic Engineer and also as a District Manager. Mr. Tozier had been with the Company 23 years, a Traffic Manager and District Traffic Superintendent.

"In view of our further experience, we are irresistibly led to the conclusion that Tozier and Upton were nearer right and that we should use a factor of 3 rather than 2, a minimum figure.

"Complainant alleges that it is aggrieved by said finding and ruling and that its rights are substantially prejudiced thereby in that said finding and ruling forms the basis for an erroneous exclusion of complainant's property used in providing intrastate service in Maine and forms the basis for an erroneous exclusion or disallowance of expenses reasonably incurred in providing intrastate service in Maine and hence leads to an erroneous and unlawful determination of earnings and return being received by complainant."

The Commission here complains because the Company in applying its separations has given major consideration to the factor of actual use. As we have said before, this is the

major element to which consideration should have been given. The refusal to give to this factor due consideration constitutes in itself justifiable ground of exception. Nor are we particularly sympathetic with the reasons which the Commission gives for its failure to do so, i.e., that it felt called on to give to other factors more consideration than to us seems proper to allocate to those factors. This exception must be sustained.

## EXCEPTION 10.

This exception reads as follows:

> "This procedure does not result in any less money for the New England Telephone and Telegraph Company. It does not require any larger payments by the customer. It simply means that more property is assigned to A.T.&T. Co. to support and the expenses in connection with that property would be paid for by A.T.&T. Company.

> "Complainant alleges that it is aggrieved by said finding and ruling and that its rights are substantially prejudiced thereby in that said finding and ruling wrongfully assumes that complainant can recover losses of intrastate revenue and earnings, to which it is lawfully entitled, from interstate service or from persons or corporations not engaged in rendering or using intrastate service in Maine."

The above ruling of the Commission which prompted this exception seems to us the most unjustifiable of all. It substantiates what we have before intimated—that the Commission is attempting to justify the correctness of its ruling on this point because the result of doing so may mean the giving of lower rates to intrastate service in Maine than would otherwise be the case. It says in effect that the allotment of the income which will make up the difference between the interstate and the intrastate rates is justified because the interstate rates will be compelled to carry the burden. In other words, it is permissible to take money from

certain customers so long as the income received from those customers is not allotted to intrastate use where it may properly belong. In solving the separations problem, this is exactly what the experts have been trying to avoid. We do not need to look farther than the following language of Justice Hughes in the *Minnesota Rate Cases, supra,* 57 L. Ed. at page 1556:

> "Where the business of the carrier is both inter-state and intrastate, the question whether a scheme of maximum rates fixed by the state for intrastate transportation affords a fair return must be determined by considering separately the value of the property employed in the intrastate business and the compensation allowed in that business under the rates prescribed. This was also ruled in the Smyth case (id. p. 541). The reason, as there stated, is that the state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, and, on the other hand, the carrier cannot justify unreasonably high rates on domestic business because only in that way is it able to meet losses on its interstate business."

This exception is sustained.

### Conclusion

The constitutional question of whether the rates fixed by the Commission are confiscatory has not been considered in this opinion and we express no opinion on that point. The problem is much narrower than that—namely, whether the Commission in setting up its standards for fixing its rate base and allotting the expenses chargeable to intrastate service has followed Sections 16 and 17 of Chapter 40 of the Revised Statutes of Maine.

In establishing its rate base on which a reasonable return is purportedly allowed by the schedule of rates which the

Commission has permitted the Company to establish, the Commission has ignored the question of the fair value of the Company's property.  It has sought to establish a rate base on its own theory of what would be best for the people of this state, the so called prudent investment theory which may be quite different from the standard of fair value which the statute requires it to respect.  This error in and of itself constitutes a valid ground of exception and requires us to remand this case for a new decree giving full effect to the principles set forth in this opinion.  Furthermore, in applying the rate base which it has set up, the Commission has committed errors which constitute an arbitrary exercise of power.

The problems in this case are the outgrowth of our dual form of government under which the states are recognized as supreme in their control over state affairs, and the authority of the federal government as exclusive in national affairs.  To mark the limits of each sovereignty within its own sphere is an exceedingly complex problem, made more difficult by the fact that the facilities used in performing both interstate and intrastate services are used in common by both services.  The solution of this intricate matter is not made easier by the failure of the Public Utilities Commission to follow the statute of our own state with respect to fair value.  The question is a jurisdictional one.

The Company is entitled to earn a reasonable and just return on the fair value of its property devoted to the public service within the State of Maine after making due allowance for the expenses of operating its plant and facilities within the State of Maine.

Justice Hughes in his opinion in the *Minnesota Rate Cases, supra,* though it concerned rates on the railroads of the country, involved practically the same question as is here presented.  It was there held that it could be decided

only by giving due consideration to the relative use of the facilities of the railroads in intrastate and in interstate service after apportioning the expenses which should be properly allocated to each service.

In the two *North Dakota* cases, and in fact in all of our own cases, fair value is held to be present value, value at the time the inquiry is made, and must include increases in value over original cost. Thus the amount of the capital prudently invested in the property, though it is a factor which may be considered, is given a secondary place in determining fair value.

The method of approach to the problem which the Commission has adopted leads almost inevitably to the errors of which the Commission has been responsible here. It has been more concerned with the result at which it was going to arrive than with the methods by which it reaches that result. It should have given heed to the words of our early commission where it is said in the *Hines* case, *supra*, "we are not satisfied that we should disregard the rulings of the highest court of our State, or those of the highest court in the nation spoken finally by no less an authority than Justice Hughes; nor undertake to hold that when the legislature said 'value' it meant 'investment'. Commissions are not a law unto themselves, and they have no right to take short cuts across the rights of others—even of those engaged in a public service—to reach popular results."

*Exceptions sustained.*

*Case remanded to the Maine Public Utilities Commission for a decree upon the existing record in accordance with this opinion.*