**In re STRATTON WATER COMPANY PROPOSED INCREASE IN RATES.**

Supreme Judicial Court of Maine.

April 4, 1978.

Before DUFRESNE, C. J., and POMEROY, WERNICK, ARCHIBALD, DELAHANTY and GODFREY, JJ.

ARCHIBALD, Justice.

On July 16, 1974, Stratton Water Company (Stratton) filed with the Maine Public Utilities Commission (the Commission) a rate revision application designed to increase its revenues by 41%.

After initially suspending the operation of these rates, the Commission, on April 14, 1975, issued its decree (F.C. # 2073) disallowing the rates as filed. The Commission authorized Stratton to file a new schedule of rates designed to produce gross operating revenue of $17,708.00. In addition, the decree provided in part:

> "That before new rates shall become effective, Stratton Water Company and its owner and President, Richard N. Berry, Sr., furnish documentary evidence that $20,000 was actually invested in Stratton Water Company in return for the 200 shares of common stock authorized to be issued by this Commission's decision in U. # 2723 and sold to Richard N. Berry, Sr."

In an attempt to comply with F.C. # 2073, Berry provided the Commission with information concerning his stock holdings in Stratton. This disclosure revealed that the 200 shares of common stock, authorized to be issued and sold to Berry pursuant to U. # 2723 in 1966, were issued in return (1) for the surrender of a $10,000.00 note given by Stratton to its previous owner, Almon Sargent, and (2) for the cancellation of both $8,999.12 in accounts payable to Sargent and $1,000.88 owed by Stratton to Berry for engineering services and interest on the Sargent note. It was further represented that Sargent had the note and accounts payable ($18,999.12) assigned to Berry in 1963 when Berry purchased Stratton from him.

Murray, Plumb & Murray by Peter L. Murray, Portland (orally), for plaintiff.

Alan G. Stone (orally), Public Utilities Commission, Horace S. Libby, Thomas R. Gibbon, Augusta, for defendant.

Vincent A. Drosdik, Jr., Rangeley, for intervenor, Town of Eustis.

Not being satisfied with the information thus supplied, the Commission held a hearing on June 9, 1975, to resolve questions concerning Berry's stock holdings in Stratton. At this hearing Berry was questioned by the staff of the Commission concerning certain allegedly misleading statements made by him to the Commission in 1966. The transcript of the 1966 hearing was introduced to show that Berry then acknowledged holding a "round figures note of $19,000" which represented "money or cash equivalent to money" he had loaned to Stratton. In fact, the "round figures note of $19,000," formerly the $10,000.00 note and $8,999.12 in accounts payable, represented money loaned to Stratton by Sargent.

Convinced that "important evidence was mischaracterized" at the 1966 hearing, the Commission issued its Supplemental Order No. 1 disallowing a percentage of the return based on the $20,000.00 loaned to Stratton. Accordingly, Stratton was authorized to file a new schedule of rates to produce gross operating revenue of $15,908.00. In its order the Commission expressly chose not to reverse its 1966 decree. In addition, the Commission stated that "if the Company can satisfy us as to the validity of the assignment of the $10,000 note . . . or the $8,999.12 in accounts payable, we will adjust the rates accordingly."

Pursuant to the terms of Supplemental Order No. 1, on August 20, 1975, Stratton filed a petition with the Commission seeking further hearings and a reconsideration of Supplemental Order No. 1 alleging that new evidence "relevant to the determination of the Commission in this proceeding has been discovered."

At a hearing on this petition held on September 24, 1975, Stratton introduced several additional items of evidence relating to Berry's stock holdings. First, Stratton introduced a copy of a 1963 agreement whereby Sargent agreed to sell all his outstanding stock (70 shares) in Stratton to Berry in exchange for $10,000.00. The agreement further provided that:

"3. Said Almon B. Sargent shall discharge the $10,000.00 note dated September 26, 1961, which said Stratton Water Company owes to said Almon B. Sargent, upon the completion of this contract."

Second, Stratton produced its original demand note to Sargent in the amount of $10,000.00, on the back of which was the following:

"NOTE FROM STRATTON WATER
COMPANY
TO A. B. SARGENT
Endorsed to Richard N. Berry"

On the face of the note there appeared the following:

"Paid 11/30/67, Richard Berry."

At the September 24th hearing Berry was questioned about paragraph # 3 of the agreement as follows:

"Q. But Provision # 3 on Page 2 of that contract says, 'Said Almon B. Sargent shall discharge the $10,000 note dated September 26, 1961, which said Stratton Water Company owes to said Almon B. Sargent, upon the completion of this contract.' And it's your testimony now that in fact what he did was directly contrary to the contract.

A. He did not—

Q. Instead of discharging it he made it over to you.

A. Right. Exactly. He did not carry through on that and we did not want him to carry through on that."

Berry further testified that his attorney advised him that Sargent should not be "wandering around with a $10,000 demand note"; and, therefore contemporaneously with the execution of the 1963 agreement, Sargent endorsed the note to Berry. Berry's attorney testified that on or about the day the 1963 agreement was signed Berry informed him that Sargent was willing to endorse the note, and he advised his client

by phone that "he should have Mr. Sargent endorse it to him 'For value received and without recourse.' "

On April 12, 1976, the Commission issued its Supplemental Order No. 3 in F.C. # 2073. In its order the Commission, after summarizing the facts, ruled:

> "We hold that for rate-making purposes, the $10,000 invested by Mr. Sargent in the Company, for which he received a note, should be treated as cost-free capital. This, we think, would be the proper result if Mr. Sargent had actually discharged the Company's debt according to the written contract. As to the accounts payable, it seems likely that Mr. Sargent intended to treat them as he did the note. However, no contract for their cancellation existed, and we will not attempt to read the intentions of a man several years dead in a transaction thirteen years completed. *We will allow rate based on $10,000 of legitimate equity arising from U. # 2723. We disallow the $10,000 based on the note."* (Emphasis supplied.)

Accordingly, the Commission authorized Stratton to file a new schedule of rates designed to produce gross operating revenue of $17,138.00.

On April 20, 1976, Stratton filed its notice of appeal pursuant to 35 M.R.S.A. § 303.[1] The notice of appeal stated that the appeal was being taken from "the decision and order of the Maine Public Utilities Commis-

sion in this matter as most recently modified by Supplemental Order No. 3 issued on April 12, 1976." [2]

*I. Scope of Review under Section 303*

■ We have recently held that
"our review of the Commission's fact-finding is in accordance with the usual test on appeal, whether there was substantial evidence to support the Commission's findings."

*Central Maine Power Company v. Public Utilities Commission,* Me., 382 A.2d 302, 317 (1978). Stated another way, the Commission's findings of fact are final if supported by any substantial evidence. *Application of Casco Castle Co.,* 141 Me. 222, 42 A.2d 43 (1945).

■ Our scope of review on a Section 303 appeal is on questions of law, and we can only intervene when

> "the Commission abuses the discretion entrusted to it, or fails to follow the mandate of the legislature, or to be bound by the prohibitions of the constitution . . . . ."

*New England Tel. and Tel. Co. v. Public Utilities Commission,* 148 Me. 374, 377, 94 A.2d 801, 803 (1953); *Central Maine Power Co. v. Public Utilities Commission,* 150 Me. 257, 261, 109 A.2d 512, 514 (1954); *Mechanic Falls Water Company v. Public Utilities Commission,* Me., 381 A.2d 1080, 1091 (1977).

---

1. 35 M.R.S.A. § 303 provides in pertinent part:
   "An appeal from a final decision of the commission may be taken to the law court on questions of law in the same manner as an appeal from a judgment of the Superior Court in a civil action."

2. We have held that for the purposes of an appeal pursuant to 35 M.R.S.A. § 303, a final judgment is one that disposes of the entire cause of action.
   "In ordering that the substituted rates be made effective, the Commission was finally disposing of the entire rate case."

*Mechanic Falls Water Company v. Public Utilities Commission,* Me., 381 A.2d 1080, 1087 (1977).
   We note in this case that there was no final judgment until April 22, 1976, when the Commission issued its Supplemental Decree No. 4 approving the revised schedule of rates submitted by Stratton pursuant to Supplemental Order No. 3. On April 26, 1976, the appellant filed a "Second Amendment to Designation of Contents of Record on Appeal" which included Supplemental Decree No. 4. We therefore treat this appeal as being taken from Supplemental Decree No. 4 dated April 22, 1976.

## II. Statement of the Issue for Review

Given the limited scope of review granted under Section 303, the issue in this case may be stated as follows:

Was the Commission's determination that $10,000.00 of equity capital invested by Sargent be treated as "cost-free" capital for rate-making purposes erroneous as a matter of law?

## III. Limitations on the Power to Regulate

The $10,000.00 note represented money loaned to Stratton by Sargent which it used to purchase so-called "operating property." Since this property was used to serve the public, Stratton became entitled to a "fair return" on that investment. *New England Tel. and Tel. Co. v. Public Utilities Commission,* Me., 354 A.2d 753, 769 (1976). The fact that Berry had Sargent endorse the note rather than discharge it, as called for by the contract, does not preclude *Stratton* from receiving a fair return on its operating property.

The commission argues that Berry, by electing not to have the $10,000.00 note discharged, subjected Stratton and its ratepayers to an unnecessary cost, and seems to be saying that Berry, as a prudent manager of Stratton, had a duty to discharge the note, thereby presenting Stratton and its ratepayers with a $10,000.00 windfall.

We do not agree.

The $10,000.00 note, as we have noted, represented a portion of Stratton's operating property upon which Stratton was entitled to a fair return. Undoubtedly Berry realized that if the note were discharged, the capital structure of Stratton would be altered in such a manner as to lessen the fair rate of return to Stratton. Sargent must have joined in this conclusion as evidenced by the fact that he did endorse the note rather than cancel it. While the record is not entirely clear on the question of who was the manager of Stratton at the time of the endorsement, it was either Berry or Sargent. Since they both concurred in the endorsement, we can only conclude that they jointly deemed such act to be prudent company management.

We think it was within the sound discretion of Berry or Sargent, whoever was acting as manager of Stratton, to decide that the note should be endorsed rather than cancelled so that an accurate presentation of Stratton's capital structure could be maintained. By having the endorsed note exchanged for 100 shares of common stock, Berry was simply transferring debt capital to equity capital without changing the overall capitalization of Stratton.[3] In other words, the total capitalization of Stratton continued to reflect the investment upon which a fair return could be earned.

We recognize that in determining just and reasonable rates, the Commission may consider whether a utility is utilizing sound management practices. 35 M.R.S.A. § 51. This Court has held, however, that the function of a public utilities commission is one of control and not management. *Central Maine Power Co. v. Public Utilities Commission,* 153 Me. 228, 244, 136 A.2d 726, 736 (1957). We cannot say that the decision to have Sargent endorse the $10,000.00 note to Berry's order was not a sound management practice.

> "It must never be forgotten that while the State may regulate with a view to enforcing reasonable rates and charges, it is not the owner of the property of public utility companies and is not clothed with the general power of management incident to ownership."

*State of Missouri ex rel. Southwestern Bell Telephone Company v. Public Service Com-*

---

**3.** For purposes of this case, the "debt capital" was the total of Stratton's long term and short term debt. The "equity capital" was represented by the par value of the outstanding common stock and Stratton's earned surplus. See tables, footnotes 4 and 5.

*mission of Missouri,* 262 U.S. 276, 289, 43 S.Ct. 544, 547, 67 L.Ed. 981 (1923).

On the facts presented by this case, the Commission exceeded its authority by substituting its judgment for that of the Stratton management.

### IV. Just and Reasonable Rates

The Legislature has mandated that in determining the rates charged by public utilities,

> "the commission shall provide such revenues to the utility as may be required to perform its public service and to attract necessary capital on just and reasonable terms."

35 M.R.S.A. § 51. In addition it has provided:

> "In determining reasonable and just rates, . . . the commission shall fix

a reasonable value upon all the property of any public utility used or required to be used in its service to the public within the State and a fair return thereon."

35 M.R.S.A. § 52. The Commission failed to comply with these statutes when it determined that $10,000.00 of equity capital of Stratton should be treated as "cost-free" capital.

In its original decree, F.C. # 2073, the Commission determined that the fair rate of return on Stratton's investment was 9.55%.[4] However, after finding that Berry's failure to discharge the $10,000.00 note resulted in "turning cost-free capital into expensive capital," the Commission determined in its Supplemental Order No. 3 that the fair rate of return was 9.13%.[5] It is readily apparent from a comparison of the two tables that the decrease in the fair rate of return from 9.5% to 9.13% is attributable

4.

"TABLE II

FAIR RATE OF RETURN

|  | Amount | % of Capital | % Cost Rate | Factor Wgt'd % |
|---|---|---|---|---|
| Long Term Debt | $31,500 | 45.81 | 7.0% | 3.21 |
| Short Term Debt | 11,000 | 16.00 | 11.0% | 1.76 |
| Total Debt | $42,500 | 61.81 |  | 4.97 |
| Common Stock | 27,000 |  |  |  |
| Earned Surplus | (738) |  |  |  |
| Total Equity | 26,262 | 38.19 | 12.0% | 4.58 |
| Total Capitalization | $68,762 | 100.00% |  | 9.55%" |

5.

"FAIR RATE OF RETURN

|  | Amount | % of Capital | % Cost Rate | Factor Wgt'd % |
|---|---|---|---|---|
| Long Term Debt | $31,500 | 53.61 | 7.0% | 3.7527 |
| Short Term Debt | 11,000 | 18.72 | 11.0% | 2.0592 |
| Total Debt | $42,500 | 72.33 |  | 5.8119 |
| Common Stock | 17,000 |  |  |  |
| Earned Surplus | (738) |  |  |  |
| Total Equity | $16,262 | 27.67 | 12.0% | 3.3204 |
| Total Capitalization | $58,762 | 100.00% |  | 9.13%" |

to the disallowance by the Commission of $10,000.00 in equity capital represented by the common stock. This was legal error. In disallowing $10,000.00 in equity capital, the Commission has altered the capital structure of Stratton in such a way as to preclude Stratton from receiving a fair rate of return. We therefore hold that the Commission must restore the $10,000.00 in equity capital to the capital structure of Stratton in order to comply with the legislative mandates. 35 M.R.S.A. §§ 51, 52.

The entry is:

Section 303 appeal sustained.

Supplemental Decree No. 4 of the Public Utilities Commission set aside.

Remanded to the Public Utilities Commission for further proceedings consistent with this opinion.

DUFRESNE, J., sat at oral argument and conference as Chief Justice but has since retired. He joins in this opinion as Active Retired Justice.