NORTHERN PACIFIC RAILWAY COMPANY *v.* STATE OF NORTH DAKOTA ON RELATION OF McCUE, ATTORNEY GENERAL.

MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY *v.* SAME.

ERROR TO THE SUPREME COURT OF THE STATE OF NORTH DAKOTA.

Nos. 420, 421.  Argued October 19, 20, 1914.—Decided March 8, 1915.

This court takes the facts as found by the state court as established unless
    (1) A Federal right has been denied as the result of a finding shown by the record to be unsupported by evidence or
    (2) A conclusion of law as to a Federal right and a finding of fact are so commingled as to make it necessary to analyze the latter.
Neither of those conditions exist in this case.
Railroad property is private property devoted to public use and the State has a broad field for the exercise of its discretion in prescribing reasonable rates for common carriers within its jurisdiction.
It is not necessary there should be uniform rates or the same percentage of profits on every sort of business; there is room for reasonable classification.
Despite this range of permissible action the State has no arbitrary power over rates; the devotion of the carrier's property to public use is qualified by the carrier's right to a reasonable reward; the State

may not select a commodity on a class of traffic even if of a low grade and instead of fixing a reasonable rate require the carrier to transport it at less than cost or for merely nominal compensation.

Public interest cannot be invoked as a justification for demands passing the limits of constitutional protection.

This court does not sit as a revisory board to substitute its judgment for that of the legislature or its administrative agent.

This court is not required to concern itself with mere details of a schedule; or to review a particular tariff which yields substantial compensation, when the profitableness of the intrastate business as a whole is not involved. But a different question arises when the State has segregated a commodity, or a class of traffic, and has attempted to compel the carrier to transport it at a loss or without substantial compensation.

There is a presumption that rates fixed by the State for intrastate traffic are reasonable and just but it is one that may be rebutted by the carrier showing, as in this case, that it is non-compensatory.

As the maximum intrastate rates on coal in carload lots fixed by ch. 51 of the laws of North Dakota are unreasonable—either requiring the carrier to transport the commodity at a loss or for a merely nominal compensation after taking into account the entire traffic to which the rates apply—the State exceeded its authority in enacting the statute which amounts to an attempt to take the property of the carrier without due process of law in violation of the Fourteenth Amendment.

26 N. Dak. 438, reversed.

THE facts, which involve the validity under the due process provision of the Fourteenth Amendment of a statute of North Dakota fixing maximum intrastate rates for transportation of coal by railroad companies, are stated in the opinion.

*Mr. Charles W. Bunn*, with whom *Mr. Charles Donnelly* was on the brief, for plaintiff in error in No. 420.

*Mr. John I. Dille*, with whom *Mr. A. H. Bright* and *Mr. John L. Erdall* were on the brief, for plaintiff in error in No. 421.

*Mr. Andrew Miller*, Attorney General of the State of North Dakota, and *Mr. C. L. Young*, with whom *Mr. John*

*Carmody* and *Mr. Alfred Tager* were on the brief, for defendants in error:

A non-compensatory rate is not necessarily confiscatory. There may be such a special commodity rate fixed by the state authorities and if the entire intrastate business yields a fair profit upon the investment devoted thereto, the special rate by itself is not a taking of property. The rule is elastic. This court has never held that a rate for service lower than is returned for the entire business or because it returns no profits is unreasonable.

*Smyth* v. *Ames*, 169 U. S. 466, does not hold that fair returns, upon property invested is an unqualified rule. The rate allowed is what the services rendered are reasonably worth. The right to dividends must give way to the paramount right of the public. *Minn. & St. L. Ry.* v. *Minnesota*, 186 U. S. 268; *Covington Turnpike* v. *Sanford*, 164 U. S. 576; *Reagan* v. *Farmers L. & T. Co.*, 154 U. S. 362; *San Diego Land Co.* v. *National City*, 174 U. S. 757; *St. Louis & S. F. Ry.* v. *Gill*, 54 Arkansas, 101; *S. C.*, aff'd 156 U. S. 649.

A carrier is not entitled to a uniform rate of return on each commodity. *Interstate Ry.* v. *Massachusetts*, 207 U. S. 79. So as to other public utilities corporations. *Willcox* v. *Consol. Gas Co.*, 212 U. S. 19; *Atlantic Coast Line* v. *North Carolina*, 206 U. S. 1.

In passing upon reasonableness of rates the interests of the public as well as the carrier are to be considered. *Matthews* v. *Corporation Comm.*, 106 Fed. Rep. 7; *Southern Ry.* v. *McNeill*, 155 Fed. Rep. 756; *Arkansas Rate Cases*, 168 Fed. Rep. 730; *S. C.*, 187 Fed. Rep. 307. State court cases are to like effect. *Southern Ry.* v. *Stoveworks*, 128 Georgia, 223; *Jacobson* v. *Wisconsin Ry.*, 71 Minnesota, 519; *Taylor* v. *Mo. Pac. Ry.*, 76 Kansas, 467; *Cantrell* v. *St. Louis &c. Co.*, 176 Illinois, 512; *McCue* v. *Nor. Pac. Ry.*, 19 N. Dak. 45. See also *Louis. & Nash. R. R. Coal Rates*, 26 I. C. C. 220; Wyman on Pub. Serv.

Corp., § 1201; Freund, Police Power, § 551; 3 Encyc. Sup. Ct. Rep. 632. *Int. Comm. Comm.* v. *Un. Pac. Ry.*, 222 U. S. 541, is not opposed to these cases.

The intrastate business of the carriers as a whole produced a fair return.

Classification of rates is proper and within the power of the State. 2 Wyman, § 1232; Beale & Wyman, § 554; *Tift* v. *Southern Ry.*, 138 Fed. Rep. 264.

Allowance should be made for the fact that coal is one of the lowest classes of freight and cheapest to transport. *Louis. & Nash. R. R.* v. *Wilson*, 132 Indiana, 517; *Trade Leagues* v. *Phila., Wil. & Balt. Ry.*, 8 I. C. C. 386; *Am. Ins. Co.* v. *Chi. & Alt. Ry.*, 74 Mo. App. 89; *Hayes* v. *Railway Co.*, 12 Fed. Rep. 309.

Shipments in carload lots should be at low rates.

In this case of coal in carload lots the revenues exceed actual outlay and there is a contribution towards expenses which would have existed even if there had been no coal hauled.

The rate was fixed as a declaration of public policy in favor of a domestic industry and the general welfare of the State. *Gladson* v. *Minnesota*, 166 U. S. 427.

The burden of showing that the rates are confiscatory is on the carrier.

MR. JUSTICE HUGHES delivered the opinion of the court.

By Chapter 51 of the Laws of 1907, the legislature of North Dakota fixed maximum intrastate rates, graduated according to distance, for the transportation of coal in carload lots. It was further provided that in case the transportation was over two or more lines of railroad it should be considered as one haul, the compensation for, which should be divided among the carriers according to their agreement or, if they could not agree, as the railroad

commissioners should decide subject to appeal to the courts. While the statutory rates governed all coal shipments, their practical application was almost solely to lignite coal.

The carriers refused to put the rates into effect, and in August, 1907, the Attorney General of the State began proceedings in its Supreme Court to obtain a mandatory injunction against the Northern Pacific Railway Company, the Minneapolis, St. Paul & Sault Ste. Marie Railway Company and the Great Northern Railway Company. The companies answered that the statute violated the Commerce Clause of the Federal Constitution, and also that it infringed the Fourteenth Amendment by fixing rates that were 'unremunerative,' 'unreasonable,' and 'confiscatory.' The Supreme Court of the State, overruling these contentions, granted the injunction. 19 N. Dak. 45. It was held that the evidence was not sufficient to overcome the presumption in favor of the rates. On writ of error from this court, the decree was affirmed without prejudice to the right of the railroad companies to reopen the case after an adequate trial of the rates. 216 U. S. 579.

This decision was rendered in the early part of the year 1910 and thereupon the rates were put into effect. After a trial for over a year, the case was reopened, voluminous testimony was taken and the Supreme Court of the State, making its separate findings of fact as to the effect of the rates in the intrastate business of each carrier, and stating its conclusions of law, entered judgment commanding the carriers to keep the rates in force. 26 N. Dak. 438. The Northern Pacific Railway Company and the Minneapolis, St. Paul & Sault Ste. Marie Railway Company have sued out these writs of error.

The period to which the testimony relates is the fiscal year ending June 30, 1911. The facts may be thus summarized:

*Northern Pacific Railway Company.*

The total revenue received by this company for the intrastate carriage of lignite coal for the fiscal year was $58,953.07. It was also deemed to be practicable to ascertain the amount of expense properly chargeable to this traffic. Upon this point, the court said: "As a result of the painstaking work of the accounting department of this railway company, and its endeavors to render all the assistance possible in determining the matter of the apportionment of expense to this commodity, as is evidenced by the care and detail in the accounting, the information furnished by the exhibits, and that the books of the company have been thrown open to the experts of the State, we are enabled to arrive, with a reasonable degree of certainty, at the proper proportion of expense that should be chargeable against the revenue received from the carriage of this commodity." 26 N. Dak., p. 446.

With respect to the division of some of the items of expense (maintenance of way and structures, and taxes), there was no dispute, and, as to the others, the range of controversy was narrow. The company contended that the traffic in question produced at the statutory rates a loss of $2,253.65; the State insisted that it yielded a profit of $2,391.63. After a detailed analysis, the state court found the charges against the revenue received from the lignite traffic to be: (1) For train operation expense, $30,850.12; (2) switching, $4,971; (3) station service, $4,182.58; (4) freight car repairs, renewals, and depreciation, $7,121.54; (5) traffic and general expenses (no loss and damage allowed), $1,456.14; (6) maintenance of way and structures, $7,119.93; (7) taxes, $2,424.15; making the total expenses, $58,125.46, and the surplus income, $827.61. *Id.*, pp. 460, 461. The summary of the findings of fact, is as follows:

"That, as to the Northern Pacific Railway Company, out of total freight receipts for lignite coal, amounting to

$58,953, the total cost of transportation, or out-of-pocket costs, together with all fixed or overhead expenses apportionable to said lignite traffic, consumed all of said receipts excepting $847, its net profit in the handling of the lignite business for the twelve months in question. That such rate is slightly remunerative, but in fact non-compensatory, considering the volume of freight carried and the property of the railroad devoted thereto." *Id.,* p. 439.

*Minneapolis, St. Paul & Sault Ste. Marie Railway Company.*

The state court regarded the statistics furnished by this company as being in the main estimates without satisfactory bases. Still, on making an elaborate examination of the facts disclosed by the record—all the testimony adduced in the three cases being available in each one so far as pertinent—and on taking judicial notice of certain local conditions, the court was able to find sufficient proof to justify it in determining that under the statutory rates the intrastate transportation of lignite coal was conducted by this company at a loss. *Id.,* pp. 461–472. A large part of the traffic, after a short haul, was delivered to connecting carriers—the Northern Pacific and Great Northern lines—and the pro-rating of the statutory compensation for the entire haul operated injuriously. As to this part, said to be 'nearly half the lignite business,' this road was 'virtually a branch line of the other two railroads in accumulating for them their lignite traffic.' It was found, further, that the value of the railway property within the State had not been established, nor had the portion of value attributable to the intrastate business been determined; and, also, that the carriage of lignite coal increased 'the railroad expenses but sixty per cent. of the usual statutory rate for the lignite haul,' that is, that this percentage of the rate covered the 'out-of-pocket cost' of the traffic, the remaining expenses in this view being such as

would have been incurred had no lignite coal been transported.

The gross receipts from the intrastate traffic in question during the fiscal year were $83,670. The final results of the court's analysis in the case of this company are thus epitomized:

"Its total receipts amount to more than its actual out-of-pocket costs, or actual costs of transportation, but are from $9,000 to $12,000 less than the total costs including fixed and overhead expenses properly chargeable to the carriage of this commodity and against the earnings therefrom. That the carriage of lignite coal by the Soo line within this State during said fiscal year was not only non-profitable, but occasioned a loss to it when its fixed expenses apportionable to all traffic are in proper proportion and amount assigned to and charged against the earnings from this commodity." *Id.*, p. 439.

In answer to the contention of the State that the company could not be heard to complain with respect to the disadvantage of the prorating with connecting carriers, inasmuch as the basis was agreed upon without an appeal to the board of railroad commissioners, the court said that it was difficult to see what other basis could have been taken, and, further, that the result, in substance, would have been the same. The amount which could thus have been gained, it was said, would have been taken 'from the net revenues of the Northern Pacific carrier principally,' and would have been insufficient to have given to the Minneapolis, St. Paul & Sault Ste. Marie company a net profit, so that 'all the difference in fact would have been that both Soo and Northern Pacific would be then hauling this freight at less than the gross cost, including, of course, out-of-pocket and all fixed charges.' *id.*, p. 483.

We understand that all the 'fixed charges,' to which the findings refer, are actual expenses which, while including taxes, do not include any return whatever upon the in-

vestment in the property whether by way of interest or otherwise.

The facts thus found must be taken to be established. This court will review the finding of facts by a state court (1) where a Federal right has been denied as the result of a. finding shown by the record to be without evidence to support it, and (2) where a conclusion of law as to a Federal right and findings of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts. *Kansas City Southern Ry.* v. *Albers Commission Co.*, 223 U. S. 573, 591; *Creswill* v. *Knights of Pythias*, 225 U. S. 246, 261; *Wood* v. *Chesborough*, 228 U. S. 672, 678. But the present case is not within either branch of the rule. *Portland Ry.* v. *Oregon Railroad Commission*, 229 U. S. 397, 412; *Miedreich* v. *Lauenstein*, 232 U. S. 236, 243, 244. It cannot be said that the findings of fact made by the state court are unsupported by evidence, and it is apparent that the substantial question raised by the assignments of error and submitted in argument arises upon the facts found. True, the Northern Pacific Company insists that on a critical examination of the evidence it would be ascertained that, instead of a net profit of about $800, it received no profit at all from the traffic in question under the statutory rate, but the remuneration as found is so slight as not to be more than nominal in view of the extent of the traffic, and in this aspect the finding is that the rate as to this company is non-compensatory. So, while the contention of the Minneapolis, St. Paul & Sault Ste. Marie Company that it proved the value of the property used by it in the intrastate business is clearly inadmissible under the decisions of this court (*Minnesota Rate Cases*, 230 U. S. 352), still in the present case the determination of that value is not necessary inasmuch as no complaint is made with respect to the company's return upon its entire intrastate business, and, so far as the attempted showing of the value

of the property devoted to the traffic in question is concerned, that also is unimportant, as whatever that value might be, it is found that no net return upon it was secured.

As to the law, the state court held:

"(a) The statutory freight rate is presumed to be reasonable, which presumption continues until the contrary appears, and the rate is shown beyond a reasonable doubt to be confiscatory.

"(b) Proof that a rate is non-compensatory—that is, while producing more revenue than sufficient to pay the actual expenses occasioned by the transportation of the commodity, but insufficient to also reimburse for that proportion of the railroad's fixed or overhead costs properly apportionable to such commodity carried—is not sufficient to establish that the rate is confiscatory in law.

"(c) In order to establish such a non-compensatory rate to be confiscatory, it must further appear that any deficit under the rate affects the net intrastate freight earnings materially, and reduces them to a point where they are insufficient to amount to a reasonable rate of profit on the amount of the value of the railroad property within the state contributing to produce such net earnings."

Accordingly, it was further held that, after establishing the value of the property employed in the production of the net intrastate freight earnings, it must appear, in order to show confiscation, either (1) that such earnings are insufficient to yield a fair return upon that value and that the commodity in question is carried for less than what is sufficient to meet all expenses, including 'out-of-pocket costs' and fixed charges, or (2) that the loss on the commodity under the rate attacked 'reduces the balance of the net intrastate freight earnings' to a point where, including the loss on the commodity rate, they fail to yield such return. 26 Nor. Dak., p. 440.

And it was because their case failed to meet these tests

that the plaintiffs in error were commanded to observe the rate.

The general principles to be applied are not open to controversy. The railroad property is private property devoted to a public use. As a corporation, the owner is subject to the obligations of its charter. As the holder of special franchises, it is subject to the conditions upon which they were granted. Aside from specific requirements of this sort, the common carrier must discharge the obligations which inhere in the nature of its business. It must supply facilities that are reasonably adequate; it must carry upon reasonable terms; and it must serve without unjust discrimination. These duties are properly called public duties, and the State within the limits of its jurisdiction may enforce them. The State may prescribe rules to insure fair remuneration and to prevent extortion, to secure substantial equality of treatment in like cases, and to promote safety, good order and convenience.

But, broad as is the power of regulation, the State does not enjoy the freedom of an owner. The fact that the property is devoted to a public use on certain terms does not justify the requirement that it shall be devoted to other public purposes, or to the same use on other terms, or the imposition of restrictions that are not reasonably concerned with the proper conduct of the business according to the undertaking which the carrier has expressly or impliedly assumed. If it has held itself out as a carrier of passengers only, it cannot be compelled to carry freight. As a carrier for hire, it cannot be required to carry persons or goods gratuitously. The case would not be altered by the assertion that the public interest demanded such carriage. The public interest cannot be invoked as a justification for demands which pass the limits of reasonable protection and seek to impose upon the carrier and its property burdens that are not incident to its engagement. In such a case, it would be no answer to say that the car-

rier obtains from its entire intrastate business a return as to the sufficiency of which in the aggregate it is not entitled to complain. Thus, in *Lake Shore & Michigan Southern Ry.* v. *Smith*, 173 U. S. 684, the regulation as to the sale of mileage books was condemned as arbitrary without regard to the total income of the carrier. Similarly, in *Missouri Pacific Ry.* v. *Nebraska*, 217 U. S. 196, it was held that the carrier could not be required to build mere private connections, and the adequacy of the receipts from its entire business did not enter into the question. And this was so because the obligation was not involved in the carrier's public duty and the requirement went beyond the reasonable exercise of the State's protective power.

We have, then, to apply these familiar principles to a case where the State has attempted to fix a rate for the transportation of a commodity under which, taking the results of the business to which the rate is applied, the carrier is compelled to transport the commodity for less than cost or without substantial compensation in addition to cost. We say this, for we entertain no doubt that, in determining the cost of the transportation of a particular commodity, all the outlays which pertain to it must be considered. We find no basis for distinguishing in this respect between so-called 'out-of-pocket costs,' or 'actual' expenses, and other outlays which are none the less actually made because they are applicable to all traffic, instead of being exclusively incurred in the traffic in question. Illustrations are found in outlays for maintenance of way and structures, general expenses and taxes. It is not a sufficient reason for excluding such, or other, expenses to say that they would still have been incurred had the particular commodity not been transported. That commodity has been transported; the common carrier is under a duty to carry, and the expenses of its business at a particular time are attributable to what it does carry. The State cannot estimate the cost of carrying

coal by throwing the expense incident to the maintenance of the roadbed, and the general expenses, upon the carriage of wheat; or the cost of carrying wheat by throwing the burden of the upkeep of the property upon coal and other commodities. This, of course, does not mean that all commodities are to be treated as carried at the same rate of expense. The outlays that exclusively pertain to a given class of traffic must be assigned to that class, and the other expenses must be fairly apportioned. It may be difficult to make such an apportionment, but when conclusions are based on cost the entire cost must be taken into account.

It should be said, further, that we find nothing in the record before us, and nothing in the facts which have been set forth with the most careful elaboration by the state court, that can be taken to indicate the existence of any standard whatever by reference to which the rate in question may be considered to be reasonable. It does not appear that there has been any practice of the carriers in North Dakota which affords any semblance of support to a rate so low. Whatever inference may be deduced from coal rates in other States, as disclosed by the record, is decidedly against the reasonableness of the rate. And it may be added that, while the rate was found to be compensatory in the case of the Great Northern Railway Company, this was distinctly shown to be due to the peculiar conditions of the traffic over that road, the differences with respect to which were fully detailed by the state court. 26 N. Dak., pp. 439, 472–480. Nearly ninety per cent. of the total intrastate traffic in lignite coal upon the three roads was over the lines of the plaintiffs in error. It is urged by the State that the commodity in question is one of the lowest classes of freight. This may be assumed, and it may be a good reason for a lower rate than that charged for carrying articles of a different sort, but the mere grade of the commodity cannot be regarded as furnishing a suffi-

cient ground for compelling the carrier to transport it for less than cost or without substantial reward.

The State insists that the enactment of the statute may be justified as 'a declaration of public policy.' In substance, the argument is that the rate was imposed to aid in the development of a local industry and thus to confer a benefit upon the people of the State. The importance to the community of its deposits of lignite coal, the infancy of the industry, and the advantages to be gained by increasing the consumption of this coal and making the community less dependent upon fuel supplies imported into the State, are emphasized. But, while local interests serve as a motive for enforcing reasonable rates, it would be a very different matter to say that the State may compel the carrier to maintain a rate upon a particular commodity that is less than reasonable, or—as might equally well be asserted—to carry gratuitously, in order to build up a local enterprise. That would be to go outside the carrier's undertaking, and outside the field of reasonable supervision of the conduct of its business, and would be equivalent to an appropriation of the property to public uses upon terms to which the carrier had in no way agreed. It does not aid the argument to urge that the State may permit the carrier to make good its loss by charges for other transportation. If other rates are exorbitant, they may be reduced. Certainly, it could not be said that the carrier may be required to charge excessive rates to some in order that others might be served at a rate unreasonably low. That would be but arbitrary action. We cannot reach the conclusion that the rate in question is to be supported upon the ground of public policy if, upon the facts found, it should be deemed to be less than reasonable.

The legislature, undoubtedly, has a wide range of discretion in the exercise of the power to prescribe reasonable charges, and it is not bound to fix uniform rates for all

commodities or to secure the same percentage of profit on every sort of business. There are many factors to be considered,—differences in the articles transported, the care required, the risk assumed, the value of the service, and it is obviously important that there should be reasonable adjustments and classifications. Nor is its authority hampered by the necessity of establishing such minute distinctions that the effective exercise of the rate-making power becomes impossible. It is not bound to prescribe separate rates for every individual service performed, but it may group services by fixing rates for classes of traffic. As repeatedly observed, we do not sit as a revisory board to substitute our judgment for that of the legislature, or its administrative agent, as to matters within its province. *San Diego Land & Town Co.* v. *Jasper*, 189 U. S. 439; *Louisville & Nashville R. R.* v. *Garrett*, 231 U. S. 298, 313. The court, therefore, is not called upon to concern itself with mere details of a schedule; or to review a particular tariff or schedule which yields substantial compensation for the services it embraces, when the profitableness of the intrastate business as a whole is not involved.

But a different question arises when the State has segregated a commodity, or a class of traffic, and has attempted to compel the carrier to transport it at a loss or without substantial compensation even though the entire traffic to which the rate is applied is taken into account. On that fact being satisfactorily established, the presumption of reasonableness is rebutted. If in such a case there exists any practice, or what may be taken to be (broadly speaking) a standard of rates with respect to that traffic, in the light of which it is insisted that the rate should still be regarded as reasonable, that should be made to appear. As has been said, it does not appear here. Frequently, attacks upon state rates have raised the question as to the profitableness of the entire intrastate business under the State's requirements. But the decisions in this class of

cases (which we have cited in the margin [1]) furnish no ground for saying that the State may set apart a commodity or a special class of traffic and impose upon it any rate it pleases, provided only that the return from the entire intrastate business is adequate. In *St. Louis & San Francisco Ry.* v. *Gill,* 156 U. S. 649, a statute fixing a maximum rate for passengers in the State of Arkansas was challenged, but the allegation and offer of proof that the rate would compel the carriage of passengers at a loss related only to a portion, or division, of the railroad and not to the result of all the traffic to which the rate in question applied. The holding that this was insufficient was in entire accord with the above stated principle,—that the rate-making power may be exercised in a practical way and that the legislature is not bound to assure a net profit from 'every mile, section, or other part into which the road might be divided.' *Id.,* p. 665. A passenger rate may apply generally throughout the State, and the effect of the rate must be considered with respect to the whole business governed by the rate. In *Smyth* v. *Ames,* 169 U. S. 466, a schedule of freight rates was involved, and, while the entire schedule was under consideration, it was recognized that in order to determine its adequacy the

---

[1] *Stone* v. *Farmers' Loan & Trust Co.,* 116 U. S. 307; *Dow* v. *Beidleman,* 125 U. S. 680, 690; *Chicago & Grand Trunk Ry.* v. *Wellman,* 143 U. S. 339, 341; *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362; *Covington & Lexington Turnpike Co.* v. *Sandford,* 164 U. S. 578; *Smyth* v. *Ames,* 169 U. S. 466; *S. C.,* 171 U. S. 361; *San Diego Land & Town Co.* v. *National City,* 174 U. S. 739; *Chicago, Milwaukee & St. Paul Ry.* v. *Tompkins,* 176 U. S. 167; *San Diego Land & Town Co.* v. *Jasper, supra; Stanislaus County* v. *San Joaquin Canal Co.,* 192 U. S. 201; *Knoxville* v. *Knoxville Water Co.,* 212 U. S. 1; *Willcox* v. *Consolidated Gas Co.,* 212 U. S. 19; *Cedar Rapids Gas Co.* v. *Cedar Rapids,* 223 U. S. 655; *Louisville* v. *Cumberland Telephone & Telegraph Co.,* 225 U. S. 430; *Minnesota Rate Cases,* 230 U. S. 352, 433; *Missouri Rate Cases,* 230 U. S. 474, 497; *Southern Pacific Co.* v. *Campbell,* 230 U. S. 537; *Allen* v. *St. Louis, Iron Mountain & Southern Ry.,* 230 U. S. 553, 556.

intrastate freight business might be segregated.  *Id.,*
pp. 535, 550.  The case of *Minneapolis & St. Louis R. R.*
v. *Minnesota,* 186 U. S. 257, involved a rate fixed by the
Railroad and Warehouse Commission of the State of
Minnesota for the intrastate transportation of hard coal
in carload lots.  There was no proof that the carrier was
compelled to transport the coal at a loss or without sub-
stantial compensation.  The principal testimony, as the
court observed, was intended to show that 'if the rate
fixed by the Commission for coal in carload lots were ap-
plied to *all* freight, the road would not pay its operating
expenses, although in making this showing the interest
upon the bonded debt and the dividends were included as
part of the operating expenses.'  It was said that it was
'quite evident' that this testimony had 'but a slight, if
any, tendency to show that even at the rates fixed by
the Commission there would not still be a reasonable
profit upon coal so carried' (*id.,* p. 266); and this conclu-
sion effectually distinguishes the case from the one at bar.
In *Interstate Street Ry.* v. *Commonwealth,* 207 U. S. 79, 84,
the decision rested upon the ground that the charter of the
company was accepted subject to the obligations imposed
by the statute there in question.  In *Willcox* v. *Consoli-*
*dated Gas Co.,* 212 U. S. 19, in addition to the rate for gas
supplied for general consumption in the City of New York,
there was a lower rate fixed for that furnished to the City
itself.  It was said by the court that the criticism of the
'wholesale' rate to the City was met by the fact that the
total returns from the sale of gas were adequate.  It was
not established in that case that this 'wholesale' rate re-
quired a service without substantial compensation in ad-
dition to cost.

It has repeatedly been assumed in the decisions of this
court, that the State has no arbitrary power over the
carrier's rates and may not select a particular commodity
or class of traffic for carriage without reasonable reward.

In *Atlantic Coast Line R. R.* v. *Florida,* 203 U. S. 256, 260, and in *Seaboard Air Line Railway* v. *Florida,* 203 U. S. 261, 270, there was an attack upon a rate on a single article, to wit, on phosphates, but the proof as to the effect of the rate and the cost of the transportation was found to be insufficient. The case of *Atlantic Coast Line R. R.* v. *North Carolina Corporation Commission,* 206 U. S. 1, involved the validity of an order of the State Commission requiring the railroad company so to arrange its schedule of transportation between two points as to make connections with through trains. It was held that the order merely compelled the carrier to perform a duty which fell within the scope of the obligations it had assumed. So far from the case being an authority for the conclusion that the validity of a particular rate cannot in any case be challenged if the return from the entire intrastate operations are deemed to be adequate, the court in the course of its opinion expressly conceded the contrary. The court said (*id.,* pp. 25, 26):

"Let it be conceded that if a scheme of maximum rates was imposed by state authority, as a whole adequately remunerative, and yet that some of such rates were so unequal as to exceed the flexible limit of judgment which belongs to the power to fix rates, that is, transcended the limits of just classification and amounted to the creation of favored class or classes whom the carrier was compelled to serve at a loss, to the detriment of other class or classes upon whom the burden of such loss would fall, that such legislation would be so inherently unreasonable as to constitute a violation of the due process and equal protection clauses of the Fourteenth Amendment. Let it also be conceded that a like repugnancy to the Constitution of the United States would arise from an order made in the exercise of the power to fix a rate when the result of the enforcement of such order would be to compel a carrier to serve for a wholly inadequate compensation a class or

classes selected for legislative favor even if, considering rates as a whole a reasonable return from the operation of its road might be received by the carrier. Neither of these concessions, however, can control the case in hand, since it does not directly involve any question whatever of the power to fix rates and the constitutional limitations controlling the exercise of that power, but is concerned solely with an order directing a carrier to furnish a facility which it is a part of its general duty to furnish for the public convenience."

In *Interstate Commerce Commission* v. *Union Pacific R. R.*, 222 U. S. 541, 549, in speaking of the carriers' concession that they were unable to determine the cost of the particular traffic in question and that a former rate had not been 'less than cost,' the court said: "This concession . . . establishes an important fact in dealing with the difficult question of determining what is a reasonable rate on a particular article. Where the rates as a whole are under consideration, there is a possibility of deciding, with more or less certainty, whether the total earnings afford a reasonable return. But whether the carrier earned dividends or not sheds little light on the question as to whether the rate on a particular article is reasonable. For, if the carrier's total income enables it to declare a dividend, that would not justify an order requiring it to haul one class of goods for nothing, or for less than a reasonable rate. On the other hand, if the carrier earned no dividend, it would not have warranted an order fixing an unreasonably high rate on such article." (See also *Southern Railway* v. *St. Louis Hay & Grain Co.*, 214 U. S. 297, 301.) In *Wood* v. *Vandalia R. R.*, 231 U. S. 1, the rate order of the state commission related to a particular sort of traffic and it appeared that the proof was insufficient to show the cost of transportation. This was also the case in *Louisville & Nashville R. R.* v. *Garrett*, 231 U. S. 298, which related to rates on particular commodities

and the order of the state commission was sustained, not because the State was at liberty to fix such rates as it might see fit upon the ground of local policy regardless of reasonable compensation and thus to require the carrier to transport the commodities in question for less than cost, but because the evidence not only failed to show that the rates were not reasonably adequate but rather tended to establish that they were (*Id.*, p. 314). The same conclusion, with respect to the same rates, was reached on further hearing in *Louisville & Nashville R. R.* v. *Finn*, 235 U. S. 601, 607.

To repeat and conclude: It is presumed,—but the presumption is a rebuttable one—that the rates which the State fixes for intrastate traffic are reasonable and just. When the question is as to the profitableness of the intrastate business as a whole under a general scheme of rates, the carrier must satisfactorily prove the fair value of the property employed in its intrastate business and show that it has been denied a fair return upon that value. With respect to particular rates, it is recognized that there is a wide field of legislative discretion, permitting variety and classification, and hence the mere details of what appears to be a reasonable scheme of rates, or a tariff or schedule affording substantial compensation, are not subject to judicial review. But this legislative power cannot be regarded as being without limit. The constitutional guaranty protects the carrier from arbitrary action and from the appropriation of its property to public purposes outside the undertaking assumed; and where it is established that a commodity, or a class of traffic, has been segregated and a rate imposed which would compel the carrier to transport it for less than the proper cost of transportation, or virtually at cost, and thus the carrier would be denied a reasonable reward for its service after taking into account the entire traffic to which the rate applies, it must be concluded that the State has exceeded its authority.

The judgments, respectively, are reversed and the cases are remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE PITNEY dissents.