## MAINE MOTOR RATE BUREAU

### RE: INCREASED MOTOR COMMON CARRIER RATES AND CHARGES ON LESS THAN STATUTORY NOTICE.

Supreme Judicial Court of Maine.

May 14, 1976.

———◆———

Preti & Flaherty, by John J. Flaherty, Harold C. Pachios, Portland, for plaintiff.

John D. Molloy, Public Utilities Commission, Augusta, for defendant.

Ralph Thompson, Hampden, for intervenor.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WERNICK, Justice.

On January 28, 1975, the Maine Motor Rate Bureau ("Bureau"), tariff agent for Maine's motor common carriers, filed with the Public Utilities Commission ("Commission") a revision of its schedule of intrastate rates and charges intended to achieve an increase of approximately 18% in intrastate revenues (hereinafter the "18% rates"). On May 7, 1975 the Commission disallowed and cancelled this revised schedule and authorized the Bureau to file instead a schedule of rates and charges designed to increase intrastate revenues by 9% (hereinafter the "9% rates"). Pursu-

ant to 35 M.R.S.A. § 303 the Bureau has seasonably appealed from the Commission's order.

We sustain the appeal and remand the case to the Commission for further proceedings.

## I.  The History of the Proceedings

The January 28, 1975 filing which gave rise to the Commission order here under appeal is the latest in a series of attempts by the Maine Motor Rate Bureau to obtain an increase in the intrastate rates and charges of Maine's motor common carriers. In the late summer of 1972, the Bureau filed a general increase of motor carrier intrastate rates and charges. On October 5, 1972, the Commission rejected that rate increase and ordered the monies collected under it to be refunded.[1] No specific findings accompanied this order but it appears that the carriers were informally advised that the Commission had rejected the increase primarily because of a lack of statistical evidence to support it.

For many months thereafter the carriers worked to develop a statistical analysis of their costs and revenues, separating them according to the character of the traffic involved—intrastate or interstate. The resulting study indicated that intrastate costs exceeded intrastate revenues—i. e., intrastate traffic was being carried at a loss.

On March 12, 1973, the Bureau once more filed revised schedules designed to increase motor carrier intrastate rates and charges. Denying the increases sought, the Commission approved increases in lesser amount—again, without making specific findings.

After the issuance of this 1973 order Commission staff members and representatives of the carriers held informal meetings. The Commission suggested that a consulting firm be retained to study Maine

---

1.  In 1972, the rate-change procedures of motor common carriers of freight were governed by 35 M.R.S.A. § 70.  This was changed in 1973.  See note 5, *infra*.

intrastate motor carrier freight rates. A request for a proposal was issued by the Commission on January 31, 1974, and the contract for the study was awarded to the firm of Stone & Webster.

In early October, 1974, Stone & Webster submitted a preliminary report to the Commission which was reviewed by the Commission staff and representatives of the carriers. At this time, there were neither objections to the report, suggestions for additions nor recommendations for changes in methodology.

In November 1974, Stone & Webster's final report was submitted to the Commission.[2] Utilizing the so-called "fully allocated cost" methodology,[3] the report showed that the expenses incurred by Maine's motor common carriers in transporting intrastate freight exceed the revenues derived from that freight by about 18.2%.

Relying on the conclusions contained in the Stone & Webster study, the Bureau filed with the Commission revised schedules designed to achieve the 18% rates, the rejection of which by the Commission is the subject of the instant appeal.

The proposed revisions were in two parts. One part would institute an increase in Maine intrastate rates to bring them to the Maine interstate level; this was designed to effect a 5.1% overall annual increase in intrastate revenues. The second part provided that a $2.00 extra charge be levied on every intrastate shipment; this was designed to effect a 12.9% overall annual increase in intrastate revenues.

The Bureau requested that the Commission authorize these rates to become effective before expiration of the "statutory notice" period of thirty days.[4] The Com-

2. The Stone & Webster report is based upon a detailed study of the operations of six motor freight carriers domiciled in Maine. Three of them are referred to as "large" carriers (operating revenues of $6,000,000 to $14,000,000 in 1973) and three are characterized as "smaller" (operating revenues of $85,000 to $600,000 for 1973). While the large carriers haul about 85% of all Maine intrastate freight, only about 15.1% of their overall revenues are derived from this intrastate traffic. Maine's smaller carriers haul the remaining intrastate freight, and this business produces about 40.2% of their total revenues.

The Stone & Webster study sought, primarily, to develop operating ratios which would indicate the profitability of Maine intrastate traffic, as well as the overall profitability of the operations of the carriers studied. An "operating ratio" is a ratio of operating expenses to operating revenues. If expenses equal revenues, the ratio is 100. As expenses exceed revenues the number increases to over 100, and in cases in which revenues exceed expenses the number is less than 100.

The study team was able to derive intrastate, interstate and overall ratios for the larger carriers, as these carriers are required by the Interstate Commerce Commission to compile and submit detailed statistics concerning their expenses and revenues. Such statistics, particularly with regard to expenses, were not available for the smaller carriers, and, therefore, no intrastate ratio for these carriers was developed by the study.

The study concluded that the smaller carriers were somewhat more profitable overall than the larger carriers, the pro forma (based on projections for 1974) combined ratio—the ratio derived when both interstate and intrastate revenues and expenses are considered—of the former being 96.9 and of the latter, 97.5.

3. The record indicates that the "fully allocated cost" method breaks down overall costs into discrete units, and then allocates each unit, on a percentage basis, between interstate and intrastate freight. Thus, if 15% by weight of the freight moving across a loading dock is intrastate freight, 15% of the freight handlers' salaries will be allocated to intrastate costs, and 85% to interstate costs. The fully allocated cost method allocates all costs actually incurred.

4. The Commission's "Rule 13, Rates and Tariffs, Paragraph 5A" provides:

"No change shall be made in any rate schedule . . . except by filing with the Commission upon thirty (30) days' notice prior to the time the same are to take effect; provided that the Commission may, in its discretion and for good cause shown, permit changes . . . upon less than the notice herein required."

This rule appears to be a restatement of the provisions of 35 M.R.S.A. § 64.

mission not only refused so to act but also, pursuant to 35 M.R.S.A. § 1554, suspended the rates and thus prevented their becoming effective even upon the expiration of thirty days.[5]

A petition to intervene filed by Maine Transportation Services—a transportation consulting firm serving Maine shippers— was allowed, and a hearing was held on March 27, 1975.

The Commission's order was issued on May 7, 1975. It stated that: (1) the Commission does not accept the conclusions of the Stone & Webster study because it has doubts as to the validity of the method used for separating costs into intrastate and interstate categories; (2) the requested 18% rates would, if implemented, result in an overall operating ratio[6] of 94.8, while the 9% rates the Commission was allowing would produce an overall ratio of 96.2

"which compares favorably with the . . . [overall ratio for the other five New England states] of 96.9%";

(3) "in view of the present economy" it is not "possible or prudent to seek a 93% operating ratio[7] through rate increases calculated on present, or very recent, traffic figures"; and (4) rate inequities developing gradually "should be phased out with all reasonable speed but often not all at once."

For these reasons, the Commission disallowed the rates filed by the Bureau and authorized instead the filing of a revised schedule raising rate levels by 2.5% and instituting a $1.00 per shipment extra charge to be assessed in addition to the appropriate rates. The rates allowed were exactly one-half of those requested by the Bureau and resulted in an overall increase in revenues of approximately 9%.

## II. The Bureau's Position

The Bureau's contentions on appeal are: (1) the 9% rates authorized by the Commission are confiscatory and (2) the evidence of record proves *as a matter of law* that the 18% rates originally filed by the Bureau are the minimum rates which will be nonconfiscatory.

The Bureau maintains that the Commission's rejection of the conclusions reached by the Stone & Webster study resulted from legal error, and, once the error is eliminated, the evidence—as constituted by the Stone & Webster study and conclusions—establishes indisputably that Maine's motor common carriers are spending $1.18 to carry freight on which $1.00 is earned. Hence, the Bureau asserts that (1) to the extent said freight carriers are operating at a loss their property is being confiscated; and (2), therefore, the 18% rates, as the minimum to allow the carriers to recover costs, are required *as a matter of law.*

## III. The Commission's Reasons for Rejecting the Stone & Webster Conclusions

The Commission disagreed with the Bureau's contention that the Bureau's evi-

5. As we indicated in our recent opinion in *New England Telephone & Telegraph Company v. Public Utilities Commission, et al.*, Me., 354 A.2d 753 (1976), the eight month suspension allowed by 35 M.R.S.A. § 69 does not apply to utilities engaged in the transportation of freight. As to them, 35 M.R.S.A. § 70 provides for a system of refunds, not for suspension. In 1973, the Legislature, concluding that in the case of motor carriers the refund procedure resulted in "unnecessary costs, confusion and certain inequities . . . ", revised 35 M.R.S.A. § 1554 and provided for suspension of rate revisions filed by motor common carriers of freight, such suspensions not to exceed 120 days from the date of the filing of the schedule (P.L.1973, Chapter 475). 35 M.R.S.A. § 70 is thus no longer applicable to motor carrier rates.

6. As in n. 2, the ratio derived when both interstate and intrastate revenues and expenses are considered.

7. A ratio of 93 has traditionally been considered desirable by motor carriers, and they have generally filed for rate increases whenever this ratio is exceeded.

dence, as constituted essentially by the Stone & Webster study, had established—beyond basis of rational difference and, therefore, as a matter of law—a need that the 18% rates filed by the Bureau be put into effect. We proceed to examine the various reasons assigned by the Commission for this conclusion.

### III–A. Methods of Allocation

The Commission's primary reason for rejecting the Bureau's 18% rates was that it doubted the validity of the "fully allocated costing" method used by Stone & Webster to separate the costs incurred by the carriers into intrastate and interstate components.

The fully allocated cost method does not question the propriety of any given cost. It deals with all costs actually incurred, merely attempting to divide them into intrastate and interstate portions. Mr. Morris Bradt of Stone & Webster testified,

"[o]ur assignment was to compare the overall profitability of the intrastate to the interstate freight from a—well, the best word I can put is overall basis. We were not charged with developing the avoidable cost if the intrastate was no longer handled, . . . ."

The study indicates that had an "avoidable cost" [8] approach been utilized instead of the "fully allocated" approach,

"[t]he result would show intrastate traffic to be somewhat more profitable than the findings of . . . [the] study indicate."

In light of this admission that a different method of allocation would indicate a different intrastate ratio, the Commission determined that the 18.2% deficit on intrastate freight carriage claimed by the Bureau was not proved. Stone & Webster did not consider whether certain costs, while accruing in part to the benefit of intrastate freight, were nevertheless originally incurred solely on account of interstate freight. This failure, the Commission believed, casts doubt on the validity of the 18.2% figure and makes it impossible for the Commission to accept that figure as a correct indication of the unprofitability of Maine intrastate carriage of freight by motor common carriers.

The Bureau counters with the claim that the Commission commits legal error in suggesting that an avoidable cost approach be used because such an approach is not feasible and would produce a result less accurate than that obtained through fully allocated costing.

▮▮▮ Questions of feasibility and accuracy, however, are within the reasonable discretion of the Commission. We have long held that this Court

" 'cannot review the judgment of the commission as to public policy or the discretion vested in it' under the statute." *Biddeford and Saco Gas Co. v. Portland Gas Light Co.*, Me., 233 A.2d 730, 736 (1967)

See also: *In re The Samoset Company*, 125 Me. 141, 131 A. 692 (1926); *State v. Ballard*, 152 Me. 158, 125 A.2d 861 (1956). Among the matters commended to the Commission's discretion are those relating to the accounting procedures to be employed by public utilities. See: 35 M.R.S.A. §§ 53–60. And presentation of cost evidence, whether or not it is accurately denominated an accounting procedure, is generally considered to be within the control of the appropriate regulatory agency.

---

8. Mr. Bradt defined "avoidable cost" as " . . . a cost where, for example, if you stopped hauling any intrastate traffic, the cost that you could reduce or eliminate by stopping that particular movement and continuing the rest of your movement."

As to fully allocated costs, he testified, "[a]n allocation approach is taking a particular cost and on some basis allocating that cost between the amount of it that is applicable to the interstate freight and the amount that is applicable to intrastate freight and proportioning the cost between the two."

See: *Rules to Govern Assembling & Presenting Cost Evidence,* 337 I.C.C. 298 (1970). In the language of the Supreme Court of the United States,

> "on a subject of transportation economics, such as this one, the Commission's judgment is entitled to great weight. The appraisal of cost figures is itself a task for experts, since these costs involve many estimates and assumptions and, unlike a problem in calculus, cannot be proved right or wrong. They are, indeed, only guides to judgment. Their weight and significance require expert appraisal." *New York v. United States,* 331 U.S. 284, 328, 67 S.Ct. 1207, 1230, 91 L.Ed. 1492 (1947)

We thus find it beyond our province on this record to evaluate the practicality or accuracy of the avoidable cost method of allocation.

The Bureau makes an additional claim, however, that the Commission committed *constitutional* error in rejecting the Stone & Webster conclusions because the Stone & Webster study failed to utilize an "avoidable cost" approach. The Bureau argues that *Northern Pacific Ry. Co. v. North Dakota ex rel. McCue,* 236 U.S. 585, 35 S.Ct. 429, 59 L.Ed. 735 (1915) is controlling precedent establishing that it would be unconstitutional to utilize an avoidable cost approach in allocating the expenses of the carriers.

The *Northern Pacific* case concerned North Dakota's fixing of a maximum intrastate rate for the transportation of lignite coal by rail. The railroads there argued that the rates fixed were below cost and, therefore, confiscatory. Upholding the rates, the North Dakota Court had

made the point that the out-of-pocket expenses[9] incurred by the railroads in hauling the coal amounted to only 60% of the revenues derived from this carriage. Thus, there was a return to the railroads over and above their out-of-pocket costs.

The Supreme Court of the United States reversed the state court's decision, rejecting the premise upon which it was based. The Court said,

> ". . . we entertain no doubt that, in determining the cost of the transportation of a particular commodity, all the outlays which pertain to it must be considered. We find no basis for distinquishing in this respect between so-called 'out-of-pocket costs,' or 'actual' expenses, and other outlays which are none the less actually made because they are applicable to all traffic, instead of being exclusively incurred in the traffic in question. . . . *It is not a sufficient reason for excluding such, or other, expenses to say that they would still have been incurred had the particular commodity not been transported. . . .* The State cannot estimate the cost of carrying coal by throwing the expense incident to the maintenance of the roadbed, and the general expenses, upon the carriage of wheat; . . . ." *Northern Pacific Ry. v. North Dakota ex rel. McCue,* supra, 236 U.S. 585, 596–597, 35 S.Ct. 429, 433 (emphasis supplied)

Asserting that *Northern Pacific* deals with "fixed" costs, the Commission contends that it must be deemed irrelevant to the subject of "avoidable" costs here under consideration.

We agree that *Northern Pacific* deals with allocation of fixed costs,[10] but we re-

---

9. For present purposes, we define "out-of-pocket" expenses as the necessary "immediate cash outlay" involved in the provision of any service. *Mississippi Railroad Commission v. Mobile and Ohio R.R. Co.,* 244 U.S. 388, 395, 37 S.Ct. 602, 61 L.Ed. 1216 (1917). This presumes the existence of necessary facilities (eg. trucks) and considers only added costs (eg. fuel) of a particular traffic.

10. A definition of this term appears in the report of the hearing examiner in *Rules to Govern Assembling and Presenting Cost Evidence,* supra, 365. The report states,

"[t]he costs which cannot be traced to any particular output are generally said to have been incurred on behalf of the operations as a whole, and are termed constant or fixed costs . . . ."

ject the Commission's claim that the case thereby loses significance for present purposes.

We understand, from the definitions contained in the record, that an "avoidable cost" is one which will cease with the elimination of a certain class of traffic. The discontinuance of railroad passenger service would, for example, eliminate the cost of printing passenger tickets. This is an "avoidable cost." We further understand that all costs which are not "avoidable" are "unavoidable." Since we are convinced that this is the correct significance of "unavoidable" costs, each "fixed" cost must, in addition to being "fixed", be also either avoidable or unavoidable relative to a given class of traffic. For this reason, even though *Northern Pacific* is concerned with "fixed" costs, it may still have bearing upon the outcome of the instant case.

We do not presently evaluate whether fixed costs are of necessity unavoidable but rather concentrate attention upon the pronouncements of the Supreme Court of the United States directed to the constitutionality of the avoidable cost approach to allocation.

█ We believe that *Northern Pacific* makes plain that one cannot look merely to the savings resulting from the discontinuance of a class of traffic to determine the cost of that traffic. This same rule was restated by the Court some ten years after *Northern Pacific* in the case of *Banton v. Belt Line Railway Corp.*, 268 U.S. 413, 45 S.Ct. 534, 69 L.Ed. 1020 (1925) in which the Court said:

"The cost of doing . . . [a class of business] is not, and properly cannot be, limited to the amount by which the total operating expenses would be diminished by the elimination of, or increased by adding, the . . . [specific traffic] in question. It would be arbitrary and

unjust to charge to that class of business only the amount by which the operating expenses were, or would be, increased by adding that to the other traffic carried." (p. 421 of 268 U.S., p. 537 of 45 S.Ct.)

After the decisions in *Northern Pacific* and *Banton* there were changes in national transportation policy which, sometimes, have been interpreted as allowing for the subsidizing of one class of traffic, for example, railroad passenger traffic, by another, such as railroad freight.[11] However, these changes have no bearing on the instant case since (1) they do not alter the basic approach to developing underlying costs but merely recognize that some kinds of transportation, not capable of being carried on at a profit, are nonetheless essential to a sound and complete system of national transportation, and (2) they allow certain interstate traffic to be subsidized by other interstate traffic and thus do not violate the established law that intrastate traffic cannot be forced to subsidize interstate traffic, nor vice versa. *The Minnesota Rate Cases*, 230 U.S. 352, 33 S.Ct. 729, 57 L.Ed. 1511 (1913); *New England Telephone and Telegraph Company v. Public Utilities Commission*, 148 Me. 374, 94 A. 2d 801 (1953). We agree with the view of the Supreme Court of New Jersey that

[a]nalysis of . . . decisions of the United States Supreme Court . . . indicates that where the state action under review involves a specific operation, such as the running of a certain transportation unit or the carriage of passengers over a particular portion of the railroad's lines, the consideration of public need for the service may be paramount to the operating loss and save the order from invalidation on constitutional grounds, but where entire services are concerned, . . . although different categories of service may be required to be supplied at lower rates of return than others, no category of service may con-

11. See, eg: 54 Stat. 899; *King v. United States*, 344 U.S. 254, 73 S.Ct. 259, 97 L.Ed. 301 (1952).

stitutionally be required to be maintained at a loss." *Central R. Co. of New Jersey v. Department of Public Utilities,* 10 N.J. 255, 90 A.2d 1, 5, 6 (1952)

We conclude, therefore, that to use for rate fixing purposes a cost allocation method which attributes to intrastate freight only those costs which disappear if intrastate traffic ceases to be carried would violate the Constitution of the United States, as interpreted in *Northern Pacific Ry. v. North Dakota ex rel. McCue,* supra, and *Banton v. Belt Line Railway Corp.,* supra.

Yet, this conclusion is not in itself sufficient to resolve the cost allocation issue here presented. We are unable to discern from the instant record, the order of the Commission or its brief submitted to this Court the nature of the Commission's conception of the term "avoidable cost." In the Commission's order the avoidable cost method is referred to as a "marginal cost approach." This could be taken to mean an approach which considers only the out-of-pocket costs of a traffic, without allocating any portion of other costs incurred. Were this the Commission's conception, our above analysis of the applicable law indicates that such an approach may not validly be used in rate-setting proceedings.

Despite this reference to "marginal" costs, however, other parts of the record seem to indicate that the Commission was concerned with the possible avoidable nature of certain costs which are not "out-of-pocket" or "marginal" costs. Mr. Frederick Astle, Vice President of Administration and Finance for a major Maine carrier testified before the Commission. Mr. Molloy, counsel for the Commission staff, asked Astle what proportion of present terminals and equipment could be eliminated if his carrier should discontinue its intrastate business. The witness answered that about one-half of one of the company's terminals could be rented out.

As we conceive the conventional meaning attributed to "out-of-pocket" costs, they are *not* general expenses, such as maintenance of railroad track or of motor carrier terminals. Thus, by pursuing the above-stated line of questioning, the Commission seems to have undertaken to develop a type of avoidable costing which was not considered in *Northern Pacific* or *Banton,* and the use of which, therefore, might be constitutionally tolerable. In the instant record, however, the Commission has only opened the door to this possibility and has not delineated the ramifications of the method of allocation suggested.

We find ourselves, therefore, in a predicament similar to that confronted by the Supreme Court of the United States in *Atchison, Topeka & Santa Fe R. Co. v. Wichita Board of Trade,* 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973). There, the Court reviewed an order of the Interstate Commerce Commission approving the imposition of a special charge by railroads for grain inspected while in transit. The I.C.C. ruling constituted a departure from a longstanding Commission rule that separate charges are unlawful unless the carriers meet the burden of showing that the general transportation rates are insufficient to cover inspections. Mr. Justice Marshall, writing for the plurality, stated that he could not determine from the Commission order the policies which the Commission was pursuing. This created a serious obstacle to intelligent judicial review,

"[f]or we must know what a decision means before the duty becomes ours to say whether it is right or wrong." (p. 807 of 412 U.S., p. 2374 of 93 S.Ct.)

Relying on

"the 'simple but fundamental rule of administrative law,' . . . that the agency must set forth clearly the grounds on which it acted", (p. 807 of 412 U.S., p. 2374 of 93 S.Ct.)

the Court remanded the case to the I.C.C.

In a case such as that presently before us, in which we review the acts of an administrative body, the problem of interpreting properly the decision and order being reviewed is particularly acute. In a case reaching us on appeal from the judgment of a court, we may uphold what we find to be a proper result, even if we disagree with the accompanying reasoning, for we may engraft our own rationale upon the decision reached. *Laferriere v. Paradis,* Me., 293 A.2d 526 (1972). However,

"in dealing with a determination or judgment which an administrative agency alone is authorized to make, [a court] must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain . . . set aside exclusively for the administrative agency." *Securities & Exchange Commission v. Chenery Corporation,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)

"[A]n important corollary of the foregoing rule" also bears upon the difficulty we presently face:

"If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive." (pp. 196, 197 of 332 U.S., p. 1577 of 67 S.Ct.)

Thus, on the instant record we are unable to determine the constitutionality of the approach to allocation offered by the Commission as its primary reason for rejecting the Stone & Webster study and the need for an 18% increase in revenues established by it.

Hence, we cannot uphold the order of the Commission on this basis.

We proceed, therefore, to examine the Commission's other reasons for rejecting the Bureau's evidence to ascertain whether they may be supportable.

### III–B. "Phased Out" Rate Inequities

One of the tasks undertaken by the Stone & Webster research team was a computation of the revenues which would be generated were the intrastate rate schedules of the New England Motor Rate Bureau (N.E.M.R.B.)—tariff agent for motor common carriers in New Hampshire, Vermont, Massachusetts, Connecticut and Rhode Island—applied to Maine intrastate traffic.[12] The study concluded that the adoption of the N.E.M.R.B. rates

"might have a severe economic impact on shippers and consumers in Maine . . . [and] might lead to lower traffic and revenues."

In reaching its decision in the instant case, the Commission decided that the Bureau's 18% rates would also have a severe economic impact on Maine's shippers and consumers, and, because of a resulting decrease in traffic, the rates filed by the Bureau would not generate an increase in revenues of 18%. The Commission then made its own determination that an increase of 9% would produce maximum benefits to carriers and shippers.

In its brief, the Commission discusses the desirability of phasing out rate inequities overtime. It argues that the Stone & Webster study provided the first concrete indication that some Maine carriers were carrying intrastate traffic at a loss. The Commission concludes from the study that inequities in motor common carrier

12. At the time of the study, the N.E.M.R.B. intrastate rates exceeded Maine intrastate rates by some 27.1%.

rate structures have developed gradually, over a period of time, and that it is not wise to implement a very large increase all at once, in light of (1) the competition represented by alternative modes of carriage; (2) evidence of recent declines in the volume of business of motor carriers; and (3) the generally poor state of the economy.

The Bureau views this approach of the Commission as both an acknowledgement that Maine's carriers are experiencing an 18% loss on the carriage of intrastate freight and a decision that a compensatory rate should not be authorized until a later, indeterminate time. Such a decision is, the Bureau argues, contrary to law; 35 M.R.S.A. § 1554 requires that common carrier rates be just and reasonable. A non-compensatory rate is, the Bureau asserts, not only *per se* unreasonable but also unconstitutional as a taking of property without just compensation.

█ While predictions as to the potential economic effects of a rate are peculiarly within the expertise of the Commission, this expertise, and the deference due it, are not unbounded. The Commission may well determine that a requested increase would, if effected, inure to the detriment of both the utility and the consumer, but the Commission may not validly use this determination to set a rate which is unjust, unreasonable or confiscatory. Despite the Commission's good faith, and its superior understanding of the potential consequences of any variation in rates, this Court cannot sanction either an arbitrary rejection of competent, probative evidence, or the fixing of a rate, based solely on a desire to avoid a sudden large rate increase.

█ Thus, the Commission's determination

"that rate inequities that have grown gradually over time should be phased out with all reasonable speed but . . . not all at once . . ."

is not a sufficient reason for rejection of the conclusions of the Stone & Webster study. We view the study as a commendable effort to present to the Commission the type of concrete evidence which is basic to intelligent rate determination. This does not mean, of course, that the Commission, with its specialized knowledge, may not legitimately find fault with the study, and perhaps raise serious doubts as to its validity. It does mean, however, that the Commission may not arbitrarily disregard the study, or any other evidence tending to establish any factor critical to the determination of a just and reasonable rate. *Central Maine Power Company v. Public Utilities Commission*, 150 Me. 257, 109 A.2d 512 (1954); *New England Telephone & Telegraph Company v. Public Utilities Commission*, 148 Me. 374, 94 A.2d 801 (1953). A desire to protect shippers and consumers from the impact of a sudden large increase in freight transportation rates, and fears that such an increase may result in a decline in traffic,—however well-grounded these concerns may be—cannot serve to make legitimate a requirement that any regulated industry operate at a loss for an extended and indeterminate period. We do not presume to determine that the conclusions of the Stone & Webster study are accurate. We simply hold that a desire to have rates increase gradually rather than suddenly is not a sufficient basis for the rejection of competent, probative evidence, and cannot be cited in support of the Commission's rejection of the Stone & Webster study.

*III–C. The Present State of the Economy*

In its brief the Commission also adverts to the "present state of the economy" as a basis for rejecting the Bureau's 18% rates. In attempting to evaluate this reasoning, we face both of the problems outlined in the sections above. First, we are not at all certain what the Commission meant by

"[i]n view of the present economy we do not find it possible or prudent to seek

a 93% operating ratio through rate increases calculated on present or very recent traffic figures." [13]

Perhaps the Commission was suggesting that the data upon which Stone & Webster's conclusions rested were nonrepresentative, in that they were drawn from a period of recession. However, it is at least equally probable that the Commission is here making essentially the same kind of statement it made in regard to phasing out inequities—that a large increase is ill-advised and will cause a decrease in traffic.

■ We are not permitted to speculate regarding such matters. *Securities & Exchange Commission v. Chenery Corporation,* supra, and, therefore, cannot determine whether this purported justification for rejection of the Bureau's 18% rates is legally acceptable.

Having thus examined all of the Commission reasons for rejecting the Stone & Webster study,[14] we arrive at the following conclusions (1) some types of "avoidable costing", when used to determine the costs attributable to a given class of carrier traffic, are constitutionally suspect; (2) the record before us leaves unclear the Com-

mission's conception of "avoidable costing" and, therefore, we cannot determine whether the Commission's objection to the method of allocation used in the Stone & Webster study was based on constitutionally suspect or constitutionally permissible considerations; (3) a desire to "phase out" rate inequities cannot justify the rejection of probative, competent evidence; and (4) ambiguity in the Commission's reference to the state of the economy as a justification for its rejection of the Bureau's 18% rates leaves us unable to decide whether, in this respect, the Commission's approach is legally supportable.[15]

In light of the foregoing conclusions we remand the case to the Commission for further proceedings in conformity with this opinion.

Specifically, the Commission is directed: (1) to reconsider, by clarifying and amplifying, its conception of "avoidable costing" as a basis of objection to the Stone & Webster study and conclusions; and (2) upon such clarification and amplification, to re-evaluate, in accordance with the legal prescriptions of this opinion, whether or not, as thus ultimately developed, the Com-

---

13. An additional source of puzzlement is the Commission's reference to the historical 93% ratio since implementing the full 18% rate increase requested by the Bureau would result in an overall ratio of 94.8% rather than 93%.

14. The Commission's brief does make mention in passing of the rule that a rate must be reasonable not only to a utility but also to the customer, and, in a situation in which both ends cannot be accomplished, the rate set is to be reasonable as to the customer. This argument offers no assistance to us, as the Commission does not indicate either (1) what the value of motor freight service is to its customers, or (2) why the costs of producing this service may exceed its value. We cannot, from the record, determine any similarity between the instant case and *Hamilton v. Caribou Water, Light & Power Company,* 121 Me. 422, 117 A. 582 (1922), which the Commission cites in support of its argument. In the *Caribou Water* case, the utility was supplying its customers with water unfit

for drinking. In light of this fact, the Court upheld a Commission order allowing only rates lower than those charged for pure water, stating that it would be unjust to charge the customer more for adulterated water. We fail to see the applicability of this case to the instant record.

15. The 1973 amendment to 35 M.R.S.A. § 1554 (P.L.1973, Chapter 475) reduces the time period for Commission determination in a motor freight case from a maximum of 9 months from the date of the filing (35 M.R. S.A. § 70) to a maximum of 120 days. Perhaps, the pressures thus engendered were at least partially responsible for the Commission's failure to indicate the reasoning and fact finding underlying its order. We cannot, however, allow the Legislature's decision as to the time allowed for Commission action to create insurmountable obstacles to adequate judicial review, provision for which is also contained in the statutes applicable to public utilities.

**530**

mission's conception of "avoidable costing" would be a constitutionally valid ground for rejecting the Stone & Webster study and conclusions.

■ Depending on the Commission's determination of this constitutional question, and on such other basis as this opinion shows to be lawful, the Commission shall determine the legally appropriate effective increase in the intrastate rates and charges of Maine's motor common carriers.[16]

The entry is:

Appeal sustained. Case remanded to the Public Utilities Commission for further proceedings in conformity with this opinion.

All Justices concurring.

DELAHANTY, J., sat at argument but did not participate further in the case.

16. Since the case is being remanded to the Commission, we think it beneficial to comment on one other issue raised by the Bureau in its brief.

The Bureau argues that the Commission made erroneous findings of fact in that it found that the costs engendered by unionized labor and the maintenance of large terminal facilities should be attributed to interstate freight alone. We agree with the Bureau that such costs are not shown by the instant record to be a function of the nature of the traffic carried but vary with the *size* of the enterprise involved.

We are confused by the amount of time and energy devoted at the hearing to an attempt to differentiate between the operations of the large and small carriers. This confusion is particularly acute with reference to some of the testimony of Mr. Morris Bradt of Stone & Webster. At one point, counsel for the Commission asked Mr. Bradt, " . . . why is it that you feel that the three large study carriers had intrastate operating ratios of about 118, whereas *the three smaller carriers had intrastate operating ratios of 96.9%.*" (emphasis supplied)

It is our understanding that the Stone & Webster study (particularly that portion at I–36, I–37 of the record) was not able to derive an operating ratio for the smaller carriers because of the unavailability of necessary expense data. We think, too, that the 96.9 figure mentioned by counsel in the exchange above was the *overall* pro forma ratio of the smaller carriers, with the *intrastate component of that figure* determined by using Maine Motor Rate Bureau Rates (as opposed to New England Motor Rate Bureau Rates). It appears, however, that those attending the hearing understood the Stone & Webster study to indicate that Maine's smaller carriers were carrying intrastate traffic at a profit, while the larger carriers carried it at a substantial deficit.

We have adverted to this matter in hopes that should the case again come before this Court, the Commission or Bureau will provide us with some assistance by which we may reconcile our understanding of this portion of the study with that of the Commission and its counsel.